NOT YET SCHEDULED FOR ORAL ARGUMENT
APPEAL NO. 17-7035 (CONSLIDATED WITH APPEAL NO. 17-7039)

IN THE

## United States Court of Appeals
## for the District of Columbia Circuit

_____

AMERICAN SOCIETY FOR TESTING AND MATERIALS;
NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and
AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND
AIR-CONDITIONING ENGINEERS, INC.

*Plaintiffs-Appellees*,

v.

PUBLIC.RESOURCE.ORG, INC.,

*Defendant-Appellant*.

_____

Appeal from the United States District Court
for the District of Columbia

_____

**BRIEF OF SINA BAHRAM AS *AMICUS CURIAE*
IN SUPPORT OF DEFENDANT-APPELLANT**

_____

Phillip R. Malone
Jeffrey T. Pearlman
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 725-6369
Facsimile: (650) 723-4426
Email: jipic@law.stanford.edu

*Counsel for Amici Curiae*

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amicus curiae* certifies as follows.

**A. Parties**

Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Defendant-Appellant's brief filed August 28, 2017.

American Association of Law Libraries

American Library Association

Askin, Jonathan

Association of College and Research Libraries

Association of Research Libraries

Sina Bahram

Lila Bailey

Annemarie Bridy

Carol M. Browner

Brandon Butler

Michael A. Carrier

Michael W. Carroll

Margaret Claybrook Chon

Joan Courtney

Kyle K. Cross

Will DelRosso

Jim Dygert

Amy Vanderlyke

Fastcase, Inc.

Edward Felten

Free Law Project

Shubha Ghosh

James Gibson

David Hansen

Bruce R. James

Judicata, Inc.

Justia Inc.

Ariel Katz

Benjamin J. Keele

Seamus Lee Kraft

Sarah Hooke

Kendra K. Levine

Yvette Joy Liebesma

Lincoln Network

Brian Love

Alexander Macgillivray

Stephen McLaughlin

Andrew McJohn

David Michaels

Raymond Mosley

Tyler T. Ochoa

David Olson

OpenGov Foundation

DJ Patil

Aaron Perzanowski

John D. Podesta

David G. Post

Public Knowledge

Re:Create Coalition

Blake E. Reid

R Street Institute

Judith C. Russell

Jessica Silbey

Roger V. Skalbeck

Megan J. Smith

David E. Sorkin

Sunlight Foundation

Steven VanRoekel

Robert Walker

Ronald E. Wheeler

Beth Williams

Nicole Wong

Michelle M. Wu

Michelle M.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1(a), *amicus* represents that he has no parent corporations and that no publicly held company has a 10% or greater ownership interest in him.

**B. Rulings Under Review**

References to the rulings at issue appear in the Defendant-Appellant's brief filed August 28, 2017.

**C. Related Cases**

As far as counsel is aware, other than the cases listed in the Defendant-Appellant's brief filed August 28, 2017, the case on review was not previously before this Court or any other court, and there are no other related cases currently pending in this Court or in any other court.

### CERTIFICATE OF COUNSEL REGARDING
### NECESSITY OF SEPARATE AMICUS BRIEF

Counsel for *amicus* Sina Bahram is aware of the lead *amici curiae* brief of 62 Library Associations, *et al.*, submitted on September 22, 2017. Counsel has consulted with counsel for the lead *amici* brief. Pursuant to Circuit Rule 29(d), counsel states that a separate brief on behalf of Sina Bahram is necessary because this brief does not substantially address the same issues presented by the lead *amici* brief, particularly the history and legal basis of the fundamental right of access to the law and the impact of limited access on legal innovation, or by what we expect other *amici* to present.

Instead, this brief describes the perspectives and needs of persons with print and other disabilities and explain the details of how assistive technologies permit the disabled to access the law and legal resources, how technological barriers hamper that access, and how Defendant-Appellant's actions transformed the original standards in ways that enable greater access to the law by the disabled and therefore serve the

public interest.  Mr. Bahram expects that these perspectives will not be presented by other briefs, and has endeavored to ensure that this brief is not repetitive of arguments made by other *amici*.

Dated: September 25, 2017        Respectfully submitted,


        /s/ Phillip R. Malone
Phillip R. Malone
Jeffrey T. Pearlman
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law
School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 725-6369
Facsimile: (650) 723-4426
Email: jipic@law.stanford.edu

*Counsel for Amicus Curiae*

TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES....ii

CERTIFICATE OF COUNSEL REGARDING NECESSITY OF
SEPARATE AMICUS BRIEF ....................................................................vii

TABLE OF CONTENTS................................................................................ix

TABLE OF AUTHORITIES .......................................................................xi

GLOSSARY .................................................................................................xv

IDENTITY AND INTEREST OF AMICI CUIAE AND SOURCE OF
AUTHORITY TO FILE ................................................................................1

SUMMARY OF ARGUMENT ......................................................................5

ARGUMENT ..................................................................................................7

I.   Access by All Persons, But Particularly Disabled Persons, to the Law is a
     Fundamental Right and Essential Public Policy. .....................................7

II.  Assistive Technologies are Widely Used by Disabled Persons to Access
     the Law and Other Materials ................................................................10

III. The Incorporated Standards are Not Accessible to Visually Impaired and
     Print-Disabled Persons Without the Transformative Versions Provided by
     Public.Resource ....................................................................................15

IV.    The District Court Erred in Finding That Copyright Barred Vital
       Access to the Law by Persons with Visual or Print Disabilities..............18

     A. Public.Resource's conversion of the incorporated standards into an
        accessible format and posting of those versions is highly
        transformative and provides the print-disabled with critical access to
        the law..............................................................................................19

     B. The district court erroneously concluded that the use of additional
        steps or technologies, such as screen readers, negated any
        transformativeness of Public.Resource's conversion .........................25

CONCLUSION ............................................................................ 27

x

# TABLE OF AUTHORITIES

**Cases**

*\*Authors' Guild v. Google,*
    804 F.3d 202 (2015).......................................................................21, 26

*\*Authors' Guild, Inc., v. HathiTrust,*
    755 F.3d 87, 91 (2d Cir. 2014) ...............................12, 20, 22, 23, 24, 26

*\*Campbell v. Acuff–Rose Music, Inc.,*
    510 U.S. 569 (1994) .........................................................................20

*\*Fox News Network, LLC, v. TVEyes, Inc.,*
43 F.Supp.3d. 379 (S.D.N.Y. 2014) ....................................................22 26

*Kelly v. Arriba Soft Corp.,*
336 F.3d 811 (9th Cir. 2003)...................................................................22

*\*Perfect10, Inc., v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir.  2007)...........................................................22, 26

**Statutes**

Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12,101–12,213
    (2012) ...........................................................................................10

Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506 § 603(a),
    100 Stat. 1807 (codified as amended at Section 508 of the
    Rehabilitation Act of 1973, 29 U.S.C. § 794d) ....................................10

## Other Sources

Ass'n of Research Libraries, Report of the ARL Joint Task Force on
    Services to Patrons with Print Disabilities 7 (2012), http://
    www.arl.org/storage/documents/publications/print-disabilities-
    tfreport02nov12.pdf ..............................................................................18

Brian Wentz et al., Retrofitting Accessibility: The Legal Inequality of
    After-the-Fact Online Access for Persons with Disabilities in the
    United States, First Monday (Nov. 7, 2011), http://firstmonday.org/
    ojs/index.php/fm/article/view/3666/3077 .................................................8

Crista Earl, Can CAPTCHAs Be Made Accessible, Am. Found. for the
    Blind (Aug. 21, 2014), https://www.afb.org/blog/afb-blog/can-captchas-
    be-made-accessible/12 ..........................................................................15

Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Health Statistics,
    Pub. No. 2014-1588, Summary Health Statistics for U.S. Adults:
    National Health Interview Survey 40 (2014).........................................7

*Daniel F. Goldstein & Matthias Niska, Why Digital Accessibility
    Matters to the Legal Profession, Law Prac. Today (June 2013), https:/
    /www.americanbar.org/content/newsletter/publications/
    law_practice_today_home/lpt-archives/june13/why-digital-
    accessibility-matters-to-the-legal-profession.html ...................8, 12, 14

Daniel Goldstein & Gregory Care, Disability Rights and Access to the
    Digital World, The Fed. Lawyer 54 (Dec. 2012) ..................................12

L. Guarino Reid et al, The Accessibility of Adobe Acrobat Software for
    People with Disabilities, Am. Found. for the Blind, http://
    www.afb.org/info/afb-consulting/publications-and-presentations/
    accessibility-of-adobe-acrobat/235 ........................................................13

Lainey Feingold, Disability Rights Legal Advocacy Recent News, Law
    Office of Lainey Feingold (Jan. 9, 2016), http://lflegal.com/................14

Lainey Feingold, Note to Retailers: Chip and Pin Upgrades Must
Include Real Keypads, Law Office of Lainey Feingold (Dec. 16, 2014),
http://lflegal.com/2014/12/chip-and-pin/ ................................................14

Marrakesh Treaty to Facilitate Access to Published Works for Persons
Who Are Blind, Visually Impaired, or Otherwise Print Disabled,
pmbl., June 27, 2013, WIPO Doc. VIP/DC/8 Rev ...................................9

Matt Shipman, White House Honors Sina Bahram as a "Champion of
Change," CSC News (May 7, 2012), http://www.csc.ncsu.edu/news/
1322 ..............................................................................................................2

Proposed Information and Communication Technology (ICT) Standards
and Guidelines, 80 Fed. Reg. 10880, 10880 (proposed Feb. 27, 2015)
(to be codified at 36 C.F.R. pts. 1193, 1194)........................................11

Sarah Hilderley, Accessible Publishing Best Practice Guidelines for
Publishers 8 (2013), http://www.accessiblebooksconsortium.org/
export/sites/visionip/inclusive_publishing/en/pdf/
accessible_best_practice_guidelines_for_publishers.pdf .....................17

Sina Bahram, Consulting, SinaBahram.com, https://
www.sinabahram.com/consulting.php ...................................................2

Sina Bahram, Publications, SinaBahram.com, https://
www.sinabahram.com/publications.php .................................................1

The ADA and Entertainment Technologies: Improving Accessibility
from the Movie Screen to Your Mobile Device: Hearing Before the S.
Comm. On Health, Educ., Labor & Pensions, 113th Cong. 3–4 (2013)
(statement of Karen Peltz Strauss, Deputy Chief, Consumer &
Governmental Affairs Bureau, Fed. Commc'ns. Comm'n) .................24

The Use of Telecasts to Inform and Alert Viewers with Impaired
Hearing, 26 F.C.C.2d 917 (1970) ..........................................................10

The White House, Champions of Change: Sina Bahram,
    https://obamawhitehouse.archives.gov/blog/2012/05/07/pursuing-
    future-stem-equality ............................................................................2

U.S. Equal Opportunity Employment Commission, Reasonable
    Accommodations for Attorneys with Disabilities,
    https://www.eeoc.gov/facts/accommodations-attorneys.html...............9

United States Census Bureau, Press Release, Nearly 1 in 5 People Have
    a Disability in the U.S., Census Bureau Reports (July 25, 2012),
    https://www.census.gov/newsroom/releases/archives/miscellaneous/
    cb12-134.html ....................................................................................7

W3C, Web Accessibility Initiative, Web Content Accessibility Guidelines
    (WCAG) 2.0 at a Glance, http://www.w3.org/WAI/WCAG20/glance...13

\* Authorities chiefly relied upon are marked with asterisks.

# GLOSSARY

| | |
|---|---|
| EPUB | Electronic Publication (standard) |
| IAVIT | International Association of Visually Impaired Technologists |
| JAWS | Job Access with Speech (screenreader) |
| MathML | Mathmatical Markup Language |
| PDF | Portable Document Format |
| SDO | Standards Development Organization |
| TPM | Technical Protection Measure |
| WCAG | Web Content Accessibility Guidelines |
| W3C | World Wide Web Consortium |

## IDENTITY AND INTEREST OF AMICI CUIAE
## AND SOURCE OF AUTHORITY TO FILE

*Amicus curiae* Sina Bahram is a digital accessibility researcher and the founder of Prime Access Consulting, Inc., a consultancy dedicated to assisting a wide variety of clients in a range of industries in making their products, services, and digital presence equally available to all users using the most appropriate technology and best practices and the principles of universal design.[1]

In addition to researching human computer interaction, intelligent user interfaces, and artificial intelligence with the goal of helping users with disabilities, Mr. Bahram advocates on behalf of disabled individuals and organizations representing their interests. Mr. Bahram has authored numerous publications advocating for technical solutions to accessibility challenges, *See, e.g.,* Sina Bahram, *Publications*, SinaBahram.com, https://www.sinabahram.com/publications.php, He also has been honored by the White House as a "Champion of Change"

---

[1] No party or party's counsel authored any part of this brief or contributed money that was intended to fund its preparation or submission. No one other than *amicus* and his counsel contributed money that was intended to fund the preparation or submission of this brief.

1

for his accessibility work. *See* Matt Shipman, *White House Honors Sina Bahram as a "Champion of Change,"* CSC News (May 7, 2012), http://www.csc.ncsu.edu/news/1322; The White House, *Champions of Change: Sina Bahram*, https://obamawhitehouse.archives.gov/blog/2012/05/07/pursuing-future-stem-equality.

Mr. Bahram serves on the boards, task forces, working groups, and program committees of several accessibility-focused conferences and organizations that concentrate on EPUB (electronic publication) accessibility, MathML accessibility, and best practices for content authors and publishers to create accessible digital media, in addition to working through his consultancy, Prime Access Consulting, to achieve his clients' digital accessibility goals. *See* Sina Bahram, *Consulting*, SinaBahram.com, https://www.sinabahram.com/consulting.php. Mr. Bahram is also the chief technology officer and co-founder of the International Association of Visually Impaired Technologists ("IAVIT").

As a visually impaired individual himself, and in his capacity as an advocate for other disabled persons, Mr. Bahram has a substantial interest in the disposition of this case, the outcome of which is likely to

have a significant effect on disabled persons' ability to access, understand, and participate in the development of the law. Disabled individuals like Mr. Bahram and those for whom he advocates are acutely affected by the substance of, and changes in, among other laws, public safety or accessibility law—substance and changes that may, as in this case, incorporate standards crafted by standards development organizations ("SDOs"). Defendant's Statement of Material Facts ("DSMF"), ASTM-Dkt-122-6 at 139-151, ¶¶ 13, 22. The issue has become even more pressing for disability advocates as the federal government has encouraged agencies to forego crafting standards themselves and incorporate those developed by SDOs. *Id.* ¶ 24.

Technological barriers to fully accessing these standards prevent millions of disabled individuals, as well as the public generally, from being able to read and understand the laws that govern them. Given his history of expertise and advocacy in this issue area, and as a disabled individual who uses assistive technologies such as screen readers, Mr. Bahram is particularly well-positioned to explain the details of how assistive technologies permit the disabled to access the law, how

technological barriers hamper that access, and the potential impact of this case on disabled individuals.

This brief is submitted pursuant to Fed. R. App. P. 29(a)(2) and Circuit Rule 29(b). All parties to this appeal have granted blanket consent to the filing of *amicus curiae* briefs. Mr. Bahram provided advance notice of his intent to file to counsel for the parties and filed a Notice of Parties' Consent to Participation as *Amicus Curiae* on September 23, 2017.[2]

---

[2] *Amicus* wishes to thank former Stanford Law School Juelsgaard Intellectual Property and Innovation certified law students Joseph Montoya, Jason Reinecke, Bethany Bengfort, and Brian Quinn for their substantial assistance in drafting this brief.

## SUMMARY OF ARGUMENT

Access to the law is a fundamental right. Such access is (i) essential to ensuring meaningful citizen participation in democratic processes and institutions and (ii) promotes comprehension of and compliance with the law. This right to access is particularly important to disabled individuals, who may be especially vulnerable to disenfranchisement and exclusion from civic participation.

To exercise their fundamental right to access the law, many disabled individuals must use technologies that translate text into more accessible media. Fortunately, there is a vast array of new and innovative digital assistive technologies that significantly improve disabled persons' access to and interaction with digital text. However, if the digital text of the law is not available in sufficiently open formats, or if that text is restricted by technical measures that block digital interaction (purportedly to prevent copying), assistive technology becomes impossible or prohibitively cumbersome to use. In such situations, disabled individuals who rely on that technology are denied essential access to the law.

Plaintiffs-Appellees have made available only highly restricted copies of the incorporated standards available for public viewing in constrained online "reading rooms." As a result, those standards--and thus the law--are not accessible to a significant portion of the public. Defendant-Appellant Public.Resource.Org, Inc. ("Public.Resource") has made the law available in formats that *are* fully accessible to all, including disabled persons who use screen readers and other assistive technologies. The significant adaptation and posting of the incorporated standards by Public.Resource is highly transformative and provide a vital service to the public interest.

The district court below erred in concluding that Public.Resource's use of the standards was not transformative and did not constitute fair use under copyright law. In particular, the court wrongly concluded that, because disabled individuals must take "additional steps," such as using assistive technologies like screen readers, to read the transformed content that Public.Resource creates, transformativeness is lacking. That decision, if not corrected, will continue to deny all persons full access and to allow private organizations to act as gatekeepers to the law, depriving

millions of visually impaired or otherwise print-disabled people of access

to it.

## ARGUMENT

## I.    Access by All Persons, But Particularly Disabled Persons, to the Law is a Fundamental Right and Essential Public Policy.

Open and unimpeded access to the law is critical to public

engagement in a democracy. The ability of the public to obtain, read, and

understand the law is essential to both the effective administration of

justice and to the core principles of democracy: participation,

transparency and accountability.

Full and effective access to the law is especially important for

disabled persons. In the 2010 U.S. Census, about 56.7 million people—19

percent of the population—reported having a disability. United States

Census Bureau, Press Release, *Nearly 1 in 5 People Have a Disability in

the U.S.*, Census Bureau Reports (July 25, 2012), https://

www.census.gov/newsroom/releases/archives/miscellaneous/cb12-

134.html. In a 2012 survey conducted by the National Center for Health

Statistics, approximately 20.6 million people reported having impaired

vision or trouble reading print. Ctrs. for Disease Control & Prevention,

Nat'l Ctr. for Health Statistics, Pub. No. 2014-1588, *Summary Health Statistics for U.S. Adults: National Health Interview Survey* 40 (2014). Those with disabilities have unemployment levels three times higher than the rest of the population and significantly lower levels of educational attainment. Brian Wentz et al., Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States, First Monday (Nov. 7, 2011), http:// firstmonday.org/ojs/index.php/fm/article/view/3666/3077. This gap in resources and education makes it even more difficult for people who are blind, visually impaired, or print-disabled to meaningfully participate in social and democratic dialogue. Furthermore, despite the substantial size of this population segment, disabled individuals report that they have significant difficulty accessing legal research tools. *See* Daniel F. Goldstein & Matthias Niska, *Why Digital Accessibility Matters to the Legal Profession*, Law Prac. Today (June 2013), https:// www.americanbar.org/content/newsletter/publications/ law_practice_today_home/lpt-archives/june13/why-digital-accessibility- matters-to-the-legal-profession.html. Access to legal tools is particularly important to disabled lawyers and legal professionals who require the

8

use of these tools to perform their jobs. *See, e.g.*, U.S. Equal Opportunity Employment Commission, *Reasonable Accommodations for Attorneys with Disabilities*, https://www.eeoc.gov/facts/accommodations-attorneys.html (last visited Sept. 23, 2017).

Gaps in accessibility of the law and legal information and resources can have powerful disenfranchising effects for already vulnerable citizens. From statutes to regulations to court documents to voting ballots and much more, resources and institutions that are readily accessible only to the non-disabled exclude disabled persons from participation. The importance of full access by the disabled is emphasized in the Marrakesh Treaty, which recognizes that roadblocks to full accessibility are

> prejudicial to the complete development of persons with visual impairments or other print disabilities, [and] limit their freedom of expression, including the freedom to seek, receive and impart information and ideas of all kinds on equal basis with others, including through all forms of communication of their choice, their enjoyment of the right to education, and the opportunity to conduct research.

*Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled*, pmbl., June 27, 2013, WIPO Doc. VIP/DC/8 Rev [hereinafter Marrakesh Treaty].

Because of the significance of these roadblocks, Congress and federal agencies have increasingly recognized the importance of ensuring

that people with disabilities are able to access knowledge and information on equal terms. The Americans with Disabilities Act (originally passed in 1990) ("ADA"), for example, is one of a series of laws enacted to protect the rights of disabled persons; it expressly prohibits discrimination against people with disabilities, and requires places of public accommodation—both governmental and private—to provide disabled individuals with access to a wide variety of materials. *See* Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12,101–12,213 (2012).[3]

## II.   Assistive Technologies are Widely Used by Disabled Persons to Access the Law and Other Materials

In order to access the law, including the standards incorporated into law at issue in this case, persons with different disabilities typically require assistive technology programs or devices that operate in different

---

[3] Among many other provisions, ADA implementing regulations require public accommodations to supply "auxiliary aids and services" such as "[q]ualified readers; taped texts, . . . [and] Brailled materials" to visually impaired individuals who want to access written materials. 28 C.F.R. § 36.303(b) (2015). *See also Rehabilitation Act Amendments of 1986*, Pub. L. No. 99-506 § 603(a), 100 Stat. 1807 (codified as amended at Section 508 of the Rehabilitation Act of 1973, 29 U.S.C. § 794d); *The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*, 26 F.C.C.2d 917 (1970).

ways. Innovative technologies are now available (and constantly being improved) that allow disabled persons a greater measure of independence and participation in various aspects of society. The U.S. Access Board noted in its update to Section 508 of the Rehabilitation Act that, "since the guidelines and standards were issued in 2000 and 1998 respectively, there has been a technological revolution, accompanied by an ever-expanding use of technology and a proliferation of accessibility standards globally." *Proposed Information and Communication Technology (ICT) Standards and Guidelines*, 80 Fed. Reg. 10880, 10880 (proposed Feb. 27, 2015) (to be codified at 36 C.F.R. pts. 1193, 1194). Because of the ever increasing availability of accessibility technology, "one of the primary purposes of the [] rule is to . . . ensure that accessibility for people with disabilities keeps pace with advances in electronic and information technology." *Id.*

One key example of rapidly developing modern accessibility technology is screen-reading software. A screen-reading program, such as Job Access with Speech (JAWS), enables visually impaired and print-disabled users to access digital content. *See* Goldstein & Niska, *supra.* Screen-reading technology converts the structural language underlying

11

web pages, Hypertext Markup Language ("HTML"), into synthesized speech, which disabled individuals access via speakers, headphones, or a refreshable Braille display. *See id*; DSMF ¶ 84, 91–92. This screen-reading technology may be combined with a high-powered screen magnifier, helpful to users with dyslexia and other print disabilities. *See* Goldstein & Niska, *supra*; *Authors' Guild, Inc., v. HathiTrust*, 755 F.3d 87, 91 (2d Cir. 2014) ("'print disability' is any disability that prevents a person from effectively reading printed material. Blindness is one example, but print disabilities also include those that prevent a person from physically holding a book or turning pages."). Individuals who have dexterity impairments or disabilities may benefit more from voice command programs and tools that allow them to input speech without using a conventional keyboard or mouse. *See* Daniel Goldstein & Gregory Care, *Disability Rights and Access to the Digital World*, The Fed. Lawyer 54 (Dec. 2012).

For assistive technologies to operate effectively, the hardware, operating platform, software program, and incoming data or content must be compatible. *See* Goldstein & Niska, *supra*. Such "digitally accessible" content is "designed to be aesthetic and usable to the greatest

12

extent possible by everyone regardless of disability." *Id.* (internal quotation marks omitted). To ensure accessibility, online content must, among other things, provide text alternatives for non-text content, make it easier to see and hear content, help users navigate and find content, and maximize compatibility with current and future user tools. W3C, Web Accessibility Initiative, *Web Content Accessibility Guidelines (WCAG) 2.0 at a Glance*, http://www.w3.org/WAI/WCAG20/glance (last updated Dec. 6, 2011).

Accessibility technology—like screen-reading software—only functions effectively when used to access websites and documents that contain manipulable characters and structural data, e.g., text that could be copied and pasted using conventional viewing software. Screen readers and other accessibility programs convert those characters and data into a usable format for disabled individuals. (DSMF ¶ 91-92) As Adobe and other industry specialists have recognized, screen readers generally cannot meaningfully interact with copy-restricted image-only files, such as PDFs, unless those files are optimized for accessibility and are properly coded and tagged. *See* L. Guarino Reid et al, *The Accessibility of Adobe Acrobat Software for People with Disabilities*, Am.

13

Found. for the Blind, http://www.afb.org/info/afb-consulting/publications-and-presentations/accessibility-of-adobe-acrobat/235 (last visited Sept. 22, 2017). Even PDFs that contain character data but have not been tagged are difficult for the screen-reading program to negotiate, as words often run together and the document's text may not be read in the correct order. *See* Goldstein & Niska, *supra*.

Accessibility technology is a critical tool for significantly improving the lives and abilities of disabled persons everywhere. Achieving these benefits, however, requires that content be formatted or optimized for digital accessibility by content creators or others, such as Public.Resource.[4] Given the prevalence, low cost, and ease of modern accessibility technologies and the profound improvements they make in the lives of the disabled, the existence of technological and/or legal

---

[4] For example, recent successful digital accessibility initiatives have enabled visually impaired and print-disabled persons to independently view and order food, participate in mobile banking, and manage prescriptions. Lainey Feingold, *Disability Rights Legal Advocacy Recent News*, Law Office of Lainey Feingold (Jan. 9, 2016), http://lflegal.com/. Ensuring accessibility can often be as simple as opting for keyboards over touch screens. Lainey Feingold, *Note to Retailers: Chip and Pin Upgrades Must Include Real Keypads*, Law Office of Lainey Feingold (Dec. 16, 2014), http://lflegal.com/2014/12/chip-and-pin/.

barriers to digital accessibility is increasingly difficult to justify.[5] In particular, there is no justification for barriers to full access to the law and legal regulations.

## III. The Incorporated Standards are Not Accessible to Visually Impaired and Print-Disabled Persons Without the Transformative Versions Provided by Public.Resource

But barriers hamper access to the incorporated standards at issue in this case by visually impaired and print-disable persons. The versions offered to the public by the Plaintiffs-Appellees via the "reading rooms" on their websites are not accessible. They are "'read-only,' meaning they appear as images that may not be printed or downloaded." ASTM-Dkt-175, Memorandum Opinion ("Opinion") at 7. In other words, the standards are formatted in a way that defeats searching or software-based analysis—tools that are essential to proper functioning of screen readers. DSMF ¶ 52–53. Rather than provide the standards in a machine-readable format, the Plaintiffs offer users a limited "picture of

---

[5] Innovators have even adapted CAPTCHA technology, which uses machine-indecipherable "fuzzy characters" to differentiate pesky "bot" spammers from legitimate human users, for use by disabled individuals. *See* Crista Earl, *Can CAPTCHAs Be Made Accessible*, Am. Found. for the Blind (Aug. 21, 2014), https://www.afb.org/blog/afb-blog/can-captchas-be-made-accessible/12.

the text" that causes screen-reading devices to "stop working." *Id.* ¶ 92. This screen reading failure is unsurprising, given the text in the "reading rooms" apparently appears in a small box on the screen, in text that is often of poor quality that deteriorates with further magnification. *Id.* ¶ 56.

The Plaintiffs-Appellees do not offer print or download options. Opinion at 7. Moreover, in some cases users must sign up for accounts with the standard setting organization before they can even access the restricted content in the reading rooms. DSMF ¶ 54–55, 61. The process of signing up for an account and the steps required for verification, then subsequently logging into the account and viewing the standards, are themselves often not properly accessible to those with disabilities.[6] Thus, even the act of initially reaching the standards posted by SDOs adds further barriers to many people, in addition to the barriers imposed by the inaccessible standards.

---

[6] Based on Mr. Bahram's experience running a company that audits web sites for various sites for compliance with accessibility standards such as WCAG 2.0 (Web Content Accessibility Guidelines, a standard for web content accessibility developed through the W3C process), he is aware that at least some of the SDO websites hosting incorporated standards are not WCAG 2.0 compliant and not properly accessible.

16

In addition, the Plaintiffs-Appellees, like many other content creators, employ technological protection measures ("TPMs") on their digital works. TPMs utilize methods that function to prevent copying, such as creating a "picture of the text" rather than interactive, computer-accessible characters. But such methods often go far beyond preventing copying and in fact prevent *any sort of user interaction* with the underlying content and data. Although TPMs come in many forms, by their nature they all restrict the ways users can access and use works, "affect [accessibility] greatly," and, as applied to an otherwise completely accessible document, can often "render the content completely inaccessible." Sarah Hilderley, *Accessible Publishing Best Practice Guidelines for Publishers* 8 (2013), http://www.accessiblebooksconsortium.org/export/sites/visionip/inclusive_publishing/en/pdf/accessible_best_practice_guidelines_for_publishers.pdf.

TPMs, including the highly restricted ways in which Plaintiffs posted the online versions of their standards, hinder or outright thwart accessibility and therefore, for many disabled persons, access. By rendering text and underlying structural data either inaccessible or

impossible to interact with, these restrictions block the operation of assistive technologies that rely on reading a document's text and translating it into other media, or enlarging it, or searching it for easier access and use. Assistive technologies either cannot function at all or can only function in a limited capacity. The prevalence of TPMs on copyrighted digital content has been described as "the greatest barrier to making . . . digital resources accessible." Ass'n of Research Libraries, *Report of the ARL Joint Task Force on Services to Patrons with Print Disabilities* 7 (2012), http://www.arl.org/storage/documents/publications/print-disabilities-tfreport02nov12.pdf.

Because of these technical barriers, the "free" standards offered by SDOs are inaccessible to many print-disabled and visually impaired persons and result in such persons being denied access to the relevant standards that have been incorporated into the law.

## IV.  The District Court Erred in Finding That Copyright Barred Vital Access to the Law by Persons with Visual or Print Disabilities

While any restriction on public access to the law is impermissible, permitting assertions of copyright like those upheld by the court below to block open access to laws and standards is especially detrimental to

persons with visual or print disabilities. Almost every use of accessible technology requires the creation of a copy or the manipulation of the text in the original document. Yet the static and restricted versions of the standards made available online by Plaintiffs-Appellees severely limit or block the use of accessible technologies. This is especially problematic because many subjects that standards address—fire safety and building codes, for example—directly and disproportionately impact disabled persons.

> A. Public.Resource's conversion of the incorporated standards into an accessible format and posting of those versions is highly transformative and provides the print-disabled with critical access to the law.

Recognizing that disabled individuals would be effectively deprived of access to the law without a significant technical transformation, Public.Resource responded by acquiring copies of incorporated standards and transforming them in a variety of ways so that the standards are now, for the first time, fully accessible to visual and print-disabled readers who otherwise would not have access to them. In some cases, Public.Resources scanned or even re-typed the standards, converted the previous fixed text to HTML format, and modified the graphics and figures from static images to Mathematics Markup Language and

19

Scalable Vector Graphics formats before posting them online. Opinion at 8.

These transformations enable access to the standards by disabled persons using screen reader software and other assistive technologies. Public.Resources' conversions provide HTML code that assistive technologies make accessible for disabled individuals in forms such as speech or braille. DSMF ¶ 84, 91–92. Public.Resource's posting of these HTML-formatted standards, as well as converted graphics and figures on its website, ensure that people with print or vision disabilities could "read the standard . . . navigate to a specific place in the document . . . and search for key terms." *Id.* ¶ 91.

These are highly transformative uses of the incorporated standards that weigh strongly in favor of fair use under the first factor of the fair use analysis. Under that factor, a transformative use is one that "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message . . . ." *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 579 (1994). A use is transformative "if it does something more than repackage or republish the original copyrighted work." *HathiTrust*, 755 F.3d at 96.

20

In this case, Public.Resource's conversion of the incorporated standards from static, inaccessible text to different formats and features that can be accessed and manipulated by assistive technology, allowing them to be read aloud by a computer, or magnified, or searched for ready access, etc., does far more than simply repackage the original standards. Instead, the new versions created by Public.Resource's conversions are something new, something with a different nature and further purpose-- making *the substance of the law* compatible with assistive technologies and accessible to disabled people who could not otherwise read, interact with, and understand it.

Public.Resource's creation of searchable, manipulable, and accessible versions of the previously static standards bears important similarities to the transformation of printed books into searchable, digital databases that was found to be fair use in prior cases. For example, in *Authors' Guild v. Google*, 804 F.3d 202 (2015), the Second Circuit concluded that Google's scanning of hard-copy books into full digital copies, its creation of a searchable database of those books, and its display to readers of small portions of the text of the books were all highly transformative because they were different from the original nature and

21

purpose of the books.  *Id*. at 217-18.  The use was transformative in part because it "provide[d] otherwise unavailable information about the originals." *Id*. at 215. Similarly, in *HathiTrust*, the Second Circuit found that the scanning of books and the creation of a full-text searchable database was a "quintessentially transformative use." 755 F.2d at 96.

While *HathiTrust* and *Google* did not involve making the full copied work available to users as part of the fair use, unlike in this case, two other cases did. Public.Resource's alteration of the incorporated standards is more similar to the use made by Google in *Perfect10, Inc., v. Amazon.com, Inc*., 508 F.3d 1146 (9th Cir.  2007). There, the Ninth Circuit held that Google's copying and showing of thumbnail images in its internet search results was transformative because the thumbnail copies, which were identical to the original image in all but size and resolution, served a different function (search and initial viewing) from the original  images. *Id*. at 1165; *accord  Kelly v. Arriba Soft Corp*., 336 F.3d 811, 819 (9th Cir. 2003). Also instructive is *Fox News Network, LLC, v. TVEyes, Inc*., 43 F.Supp.3d 379, 384-85, 392-93 (S.D.N.Y. 2014), where the district court found that a service that provided subscribers with searchable video clips of television news programs, the very same content

22

as the original but made searchable through digitizing and indexing, was transformative.

Public.Resource's transformative conversion is not, as the district court analogized, akin to a simple "translation" into a different language or the "simple repackaging" of the mirror image of a work into a new format such as a CD-ROM. Opinion at 35. Instead, the data or content that results from Public.Resource's conversion is transformed physically as well as transformed in purpose – to be accessible by screen readers and other assistive technologies – from the purpose of the originally formatted and restricted versions.  This is consistent with uses easily found to be transformative in earlier cases.

In this case, Public.Resource is the only current source of this effective access to the law for print-disabled individuals. If these accessible copies of incorporated standards were not available, many citizens with disabilities would be precluded from accessing and understanding important areas of law that govern and disproportionately affect them.

Significantly, content creators cannot be relied upon to provide accessibility on their own. As the Second Circuit noted in *HathiTrust*,

"[i]t is undisputed that the present-day market for books accessible to the handicapped is so insignificant that 'it is common practice in the publishing industry for authors to forgo royalties that are generated through the sale of books manufactured in specialized formats for the blind.'" 755 F.3d at 102. Indeed, even though public pressure may have mounted for access in this case, it has not yet materialized into accessible copies of the standards for people with disabilities.[7]

---

[7] In other contexts where, unlike here, content was copyrightable, the federal government has recognized that, because copyright holders have often chosen not to serve the market for accessible formats or accessible features, accessibility must be facilitated through legislation. A senior FCC official explained this pattern before the U.S. Senate:

> Although the number of people with disabilities in the United States is said to hover around 50 million, each individual disability group—i.e., individuals who are deaf, blind, mobility disabled, etc.—typically has not been large or strong enough to exert the market pressures needed to incentivize industry to include accessibility features in their products and services. . . . Often, when market forces have failed in the past, the government has stepped in with regulatory measures to ensure that people with disabilities have the access that they need.

*The ADA and Entertainment Technologies: Improving Accessibility from the Movie Screen to Your Mobile Device: Hearing Before the S. Comm. On Health, Educ., Labor & Pensions*, 113th Cong. 3–4 (2013) (statement of Karen Peltz Strauss, Deputy Chief, Consumer & Governmental Affairs Bureau, Fed. Commc'ns. Comm'n).

B.   The district court erroneously concluded that the use of additional steps or technologies, such as screen readers, negated any transformativeness of Public.Resource's conversion

The district court acknowledged that Public.Resources efforts "may enable blind individuals, like all other individuals, to access the standards at no cost." Nevertheless, the court concluded that, because disabled persons "still may have to take additional steps" such as using screen reader programs in order to read the standards created by Public.Resource, Public.Resource's significantly altered versions of the standards are not transformative. Opinion at 36. The court's limitation on what qualifies as a transformative work is both unprecedented and wrong. The court provides no support for its conclusion, and it has no basis in fair-use precedent or in logic. Indeed, the requirement is contradicted by analogous prior cases.

The fact that users employ screen reader technology or other tools to actually read the transformed content does nothing to undermine the transformativeness of the converted versions of the standards. Nothing about the role of screen readers in accessing the content changes what Public.Resource has done: significantly altering the nature and purpose of the standards, changing them from content that is inaccessible to and

25

thus useless for most print-disabled persons into content with a different purpose and use—full access by such persons using assistive technologies.

Moreover, the flawed logic of the district court's decision is demonstrated by the findings of transformativeness in the cases discussed above.  In both *Hathi Trust* and *Google Books*, the underlying content (books) was scanned and transformed into digital versions that were searchable and manipulable in various ways. But all ultimate uses of the content by individuals required additional steps, involving additional technology, such as accessing the content with web browsers, using a personal computer or other device, over the internet, and often utilizing a search engine such as Google.

Similarly, in *Perfect10*, the identical (but for size and resolution) thumbnail images created and displayed by Google could only be located and viewed by users through the use of computers, the internet, web browsers, and search engines.  And in *TVEyes,* the service that provided subscribers with searchable video clips of television news programs was found to be transformative, even though it could only be accessed on the TVEyes website by subscribers who took the "additional steps" of using a

26

computer, the internet and a browser to access and view the site, and then used media player software to watch the clips, and then perhaps used email or social media software and/or services to share the clips. *See* 43 F.Supp.3d. at 384-85, 392-93.

Nothing about the use of these routine intermediate technologies or additional steps (like "the use of one or more additional software programs" mentioned in the decision below) suggested to any of the courts that the otherwise strong elements of transformativeness had been undermined or, as the lower court here found, "stretch[ed] . . . too far." Opinion at 37. The decision below points to no precedent requiring such a result, and there is no logical basis for its conclusion.

## CONCLUSION

Access to the law by *all* persons—disabled or not—is a fundamental right. The district court's summary judgment decision at issue misapplies copyright law to enable private organizations to control access to standards incorporated into law, and misinterprets the fair use doctrine to impose novel and unwarranted limitations of the transformative use made by Public.Resource. If not corrected, the result of this erroneous ruling will be to effectively prevent the use of assistive technologies and

27

render critical portions of the law inaccessible to persons with visual or print disabilities. The district court's decision conflicts with the most-relevant fair use precedent and with the longstanding legal imperative of and strong public interest in the right of full access to the law by everyone. The decision should be reversed.

Dated: September 25, 2017          Respectfully submitted,


<u>              /s/ Phillip R. Malone  </u>
Phillip R. Malone
Jeffrey T. Pearlman
   *Applications for Admission Pending*
Juelsgaard Intellectual Property and
   Innovation Clinic
Mills Legal Clinic at Stanford Law
School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 725-6369
Facsimile: (650) 723-4426
Email: jipic@law.stanford.edu

*Counsel for Amici Curiae*

CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Cir. R. 32(e), I certify that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced typeface using Microsoft Word for Mac version 15.30 in 14-point Times New Roman. Exclusive of the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. R. 32(e)(1), this brief contains 5141 words as reported by the Microsoft Word for Mac version 15.30 word count feature.

/s/ Phillip R. Malone
Phillip R. Malone
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 725-6369
Facsimile: (650) 723-4426
Email: jipic@law.stanford.edu

## CERTIFICATE OF SERVICE

I hereby certify that, on September 25, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Phillip R. Malone

Phillip R. Malone
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 725-6369
Facsimile: (650) 723-4426
Email: jipic@law.stanford.edu