ORAL ARGUMENT NOT YET SCHEDULED

NO. 17-7035

CONSOLIDATED WITH NO. 17-7039

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN SOCIETY FOR TESTING AND MATERIALS; NATIONAL FIRE
PROTECTION ASSOCIATION, INC.; AND AMERICAN SOCIETY OF HEATING,
REFRIGERATING, AND AIR CONDITIONING ENGINEERS, INC.,
*Appellees*,

v.

PUBLIC.RESOURCE.ORG, INC.,
*Appellant*.

*Appeal from the United States District Court for the District of
Columbia, Hon. Tanya S. Chutkan, No. 1:13-cv-1215-TSC*

**FINAL BRIEF OF APPELLEES**

ALLYSON N. HO
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
Tel: 214.466.4180
allyson.ho@morganlewis.com

*Counsel for American Society for
Testing and Materials
d/b/a/ ASTM International*

DONALD B. VERRILLI, JR.
MUNGER, TOLLES & OLSON LLP
1155 F Street, N.W., 7th Floor
Washington, D.C.  20004
Tel: 202.220.1100
donald.verrilli@mto.com

*Counsel for National Fire
Protection Association, Inc.*

**February 14, 2018**
*(additional counsel listed on inside cover)*

ANNE VOIGTS
JOSEPH R. WETZEL
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Tel: 415.318.1211
avoigts@kslaw.com
jwetzel@kslaw.com

J. BLAKE CUNNINGHAM
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, TX 78701
Tel: 512.457.2000
bcunningham@kslaw.com

*Counsel for American Society of
Heating, Refrigerating, and Air
Conditioning Engineers, Inc.*

KELLY M. KLAUS
ROSE LEDA EHLER
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel:  415.512.4000
kelly.klaus@mto.com
rose.ehler@mto.com

*Additional Counsel for National
Fire Protection Association, Inc.*

J. KEVIN FEE
JORDANA S. RUBEL
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: 202.739. 5353
kevin.fee@morganlewis.com
jordana.rubel@morganlewis.com

*Additional Counsel for American
Society for Testing and Materials
d/b/a/ ASTM International*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellees certify as follows:

**(A) Parties and Amici.** The appellant in this matter is Public.Resource.Org, Inc. ("PRO"), the defendant/counter-plaintiff in the district court.

The appellees in this matter are the American Society for Testing and Materials, National Fire Protection Association, Inc., and American Society of Heating, Refrigerating, and Air Conditioning Engineers, Inc., the plaintiffs/counter-defendants in the district court.

The following individuals/entities submitted amicus briefs to the district court: American Insurance Association; American National Standards Institute, Inc.; American Society of Safety Engineers; The Institute of Electrical and Electronics Engineers, Incorporated; International Association of Plumbing & Mechanical Officials; National Electrical Manufacturers Association; North American Energy Standards Board; Underwriters Laboratories Inc.; International Code Council, Inc.; Public Knowledge; Knowledge Ecology International; The American Library Association; Reporters Committee for Freedom of the Press; Sina Bahram; David Ardia; Stacey Dogan; Pamela Samuelson;

Jessica Silbey; Rebecca Tushnet; Jennifer Urban; and Jonathan Zittrain.

The following additional individuals/entities submitted amicus briefs on behalf of appellants in this Court: American Association of Law Libraries; Association of College and Research Libraries; Association of Research Libraries; Jonathan Askin; Lila Bailey; Annemarie Bridy; Carol M. Browner; Aneesh Chopra, Brandon Butler; Michael A. Carrier; Michael W. Carroll; Center for Science in the Public Interest; Consumers Union; Joan Claybrook; Margaret Chon; Kyle K. Courtney; Will Cross; Jim DelRosso; Amy Vanderlyke Dygert; Fastcase, Inc.; Edward Felten; Free Law Project; Shubha Ghosh; James Gibson; David Hansen; Darrell Issa; Bruce R. James; Judicata, Inc.; Justia Inc.; Ariel Katz; Benjamin J. Keele; Seamus Kraft; Sarah Hooke Lee; Kendra K. Levine; Yvette Joy Liebesman; Jessica Litman; Zoe Lofgren; Mark P. McKenna; Lincoln Network; Brian Love; Stephen McJohn; Alexander Macgillivray; Andrew McLaughlin; Beth Simone Noveck; Jennifer Pahlka; Robert B. Reich; David Michaels; Raymond A. Mosley; National Employment Law Project; Tyler T. Ochoa; David Olson; OpenGov Foundation; DJ Patil; Aaron Perzanowski; John D. Podesta; David G.

Post; Public Citizen, Inc.; Re:Create Coalition; Blake E. Reid; Betsy

Rosenblatt; R Street Institute; Judith C. Russell; Roger V. Skalbeck;

Megan J. Smith; David E. Sorkin; Sunlight Foundation; U.S. Public

Interest Research Group, Inc.; Steven VanRoekel; Robert Walker;

Ronald E. Wheeler; Beth Williams; Elizabeth I. Winston; Nicole Wong;

Michelle M. Wu.

**(B) Rulings Under Review.**  The rulings under review in this

proceeding are District Court Judge Hon. Tanya S. Chutkan's February

2, 2017 Memorandum Opinion (Dkt-175 (JA2059-JA2113)) and Order

(Dkt-176 (JA2114)), granting Plaintiffs' motion for summary judgment,

denying PRO's cross-motion for summary judgment, and permanently

enjoining PRO from the unauthorized use of nine of Plaintiffs'

copyrighted Works and infringement of Plaintiffs' trademarks.  The

district court amended a portion of the Order regarding Plaintiffs'

trademarks on April 3, 2017 (Dkt-182 (JA2118-JA2119)).  Appellant

amended its notice of appeal to include the Amended Order (Dkt-183

(JA2120-JA2122)).  Appellant also seeks review of the district court's

Order denying its motion to strike the expert report of John Jarosz

(Dkt-172 (JA2051-JA2053)).  None of the rulings have an official

published citation.

    **(C) Related Cases.**  This case has been consolidated with No. 17-

7039, *American Educational Research, et al. v. Public.Resource.Org,*

*Inc.*, which is the only related case of which counsel are aware.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, and D.C. Circuit Rules 26.1 and 28(a)(1), appellees respectfully submit the following corporate disclosure statements.

American Society for Testing and Materials ("ASTM") hereby submits the following disclosure as a nongovernmental corporate party: ASTM is a not-for-profit corporation.  It has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

National Fire Protection Association, Inc. ("NFPA") hereby submits the following disclosure as a nongovernmental corporate party: NFPA is a not-for-profit corporation.  It has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

American Society of Heating, Refrigerating, and Air Conditioning Engineers, Inc. ("ASHRAE") is a not-for-profit corporation.  It has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ..................................................................................i

CORPORATE DISCLOSURE STATEMENT ...........................................v

GLOSSARY OF ABBREVIATIONS ...................................................xviii

INTRODUCTION.................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

STATEMENT OF ISSUES.....................................................................3

STATUTES AND REGULATIONS .........................................................3

STATEMENT OF THE CASE .................................................................4

    A.    Plaintiffs Develop Standards To Promote Health,
        Safety, And Other Public Benefits........................................4

    B.    Governments Incorporate Plaintiffs' Standards To
        Promote The Public Good.....................................................5

    C.    Copyright Protection Funds The Creation Of Plaintiffs'
        Standards ............................................................................7

    D.    Plaintiffs' Standards Are Accessible Through Multiple
        Channels..............................................................................8

    E.    PRO Started Infringing Plaintiffs' Copyrights And
        Trademarks After Being Unable To Effect Legislative
        Change..............................................................................10

    F.    PRO's Actions Harmed Plaintiffs .......................................12

STANDARD OF REVIEW....................................................................13

SUMMARY OF ARGUMENT ...............................................................13

ARGUMENT ......................................................................................15

I.    PRO Infringed Plaintiffs' Copyrights .........................................15

    A.    Plaintiffs Established A Prima Facie Case Of
        Infringement ......................................................................15

# TABLE OF CONTENTS
## (continued)

Page

B.    Incorporation By Reference Does Not Destroy Plaintiffs' Copyright Protection .......................... 18

    1.    Nothing In The Copyright Act Destroys Copyright Upon Incorporation By Reference ............................. 19

    2.    Congress Has Endorsed Incorporation By Reference ...................................................... 22

    3.    The Weight Of Authority Recognizes That Incorporation By Reference Does Not Automatically Destroy Copyright Protection ............. 24

    4.    The Merger Doctrine Does Not Preclude Copyright Protection for Plaintiffs' Works ................. 30

C.    PRO Failed To Meet Its Burden To Show Fair Use ............ 33

    1.    PRO's Copying And Distribution Of Plaintiffs' Works Is Substitutional, Not Transformative ............ 34

    2.    Plaintiffs' Works Are Expressive And Merit Full Copyright Protection .................................... 40

    3.    PRO Engaged In Wholesale Copying And Distribution Of Plaintiffs' Works ................................ 40

    4.    PRO's Use Undermines The Market For Plaintiffs' Works ............................................ 41

D.    The Constitution Protects Plaintiffs' Copyrights ................. 45

II.    The District Court Correctly Held That PRO Infringed Plaintiffs' Trademarks ...................................... 49

A.    *Dastar* Does Not Preempt Plaintiffs' Trademark Claims ................................................ 50

B.    PRO's Use Of Plaintiffs' Trademarks Was Not Nominative Fair Use .......................................... 55

CONCLUSION ................................................ 58

CERTIFICATE OF COMPLIANCE ................................ 61

## TABLE OF CONTENTS
## (continued)

**Page**

ADDENDUM OF STATUTES AND REGULATIONS............................ 1a

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Institute of Physics v. Winstead PC*,
  No. 3:12-CV-1230, 2013 WL 6242843
  (N.D. Tex. Dec. 3, 2013) ........................................................ 36

*Apple Computer, Inc. v. Franklin Computer Corporation*,
  714 F.2d 1240 (3d Cir. 1983) ............................................. 30

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ............................................... 48

*Atari Games Corporation v. Oman*,
  888 F.2d 878 (D.C. Cir. 1989) ............................................ 31

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014) ................................... 34, 38, 39

\* *Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) ..................... 34, 39, 40, 41, 42

*B&B Hardware, Inc. v. Hargis Industries, Inc.*,
  135 S. Ct. 1293 (2015) ........................................................ 51

*Baker v. Selden*,
  101 U.S. 99 (1879) ............................................................... 21

*Banks v. Manchester*,
  128 U.S. 244 (1888) ............................................................ 25

*Bill Graham Archives v. Dorling Kindersley Limited*,
  448 F.3d 605 (2d Cir. 2006) ......................................... 36, 43

\* Authorities upon which appellees principally rely are marked with asterisks.

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Bond v. Blum,*
   317 F.3d 385 (4th Cir. 2003)..................................................... 36

*Building Officials & Code Administrators v. Code Technology, Inc.,*
   628 F.2d 730 (1st Cir. 1980) ..................................................... 33

\* *Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994)..................................................... 33, 34, 35, 40

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,* 150 F.3d 132 (2d Cir. 1998) ..................................................... 44

\* *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.,*
   44 F.3d 61 (2d Cir. 1994) ..................................................... 26, 27, 32, 45

*Clemente v. Federal Bureau of Investigation,*
   867 F.3d 111 (D.C. Cir. 2017) ..................................................... 13

*Coleman v. Parkline Corporation,*
   844 F.2d 863 (D.C. Cir. 1988) ..................................................... 43

*County of Suffolk, New York v. First American Real Estate Solutions,* 261 F.3d 179 (2d Cir. 2001) ..................................................... 46

*Dastar Corporation v. Twentieth Century Fox Film Corporation,* 539 U.S. 23 (2003) ..................................................... 14, 50, 51, 52

*Davis v. Blige,*
   505 F.3d 90 (2d Cir. 2007) ..................................................... 16

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003)..................................................... 47

*Feist Publications, Inc. v. Rural Telephone Service Company, Inc.,* 499 U.S. 340 (1991)..................................................... 15

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*First National Bank of Boston v. Bellotti*,
 435 U.S. 765 (1978).................................................................48

*Foxtrap, Inc. v. Foxtrap, Inc.*,
 671 F.2d 636 (D.C. Cir. 1982) ...............................................52

*Globe Newspaper Co. v. Superior Court for County of
 Norfolk*, 457 U.S. 596 (1982) ...............................................48

*Golan v. Holder*,
 565 U.S. 302 (2012).................................................................47

*Griswold v. Connecticut*,
 381 U.S. 479 (1965).................................................................48

*Hall v. United States*,
 566 U.S. 506 (2012).................................................................19

\*  *Harper & Row Publishers, Inc. v. Nation Enterprises*,
 471 U.S. 539 (1985)................................................... 39, 47, 48

*Herbert Rosenthal Jewelry Corp. v. Kalpakian*,
 446 F.2d 738 (9th Cir. 1971)..................................................31

*International Cosmetics Exchange, Inc. v. Gapardis Health &
 Beauty, Inc.*, 303 F.3d 1242 (11th Cir. 2002) .....................52

*International Information Systems Security Certification
 Consortium v. Security University, LLC*,
 823 F.3d 153 (2d Cir. 2016) ..................................................56

*John G. Danielson, Inc. v. Winchester-Conant Properties,
 Inc.*, 186 F. Supp. 2d 1 (D. Mass. 2002)...............................33

*John G. Danielson, Inc. v. Winchester-Conant Properties,
 Inc.*, 322 F.3d 26 (1st Cir. 2003) ..........................................33

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Kahle v. Gonzales*,
    487 F.3d 697 (9th Cir. 2007).................................................. 48

*Keepseagle v. Perdue*,
    856 F.3d 1039 (D.C. Cir. 2017) ........................................... 17

*Kern River Gas Transmission Co. v. Coastal Corporation*,
    899 F.2d 1458 (5th Cir. 1990)............................................. 30

*Lexmark International, Inc. v. Static Control Components,
    Inc.*, 387 F.3d 522 (6th Cir. 2004)...................................... 36

*Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*,
    466 F.3d 630 (8th Cir. 2006)............................................... 52

*Miller v. French*,
    530 U.S. 327 (2000)............................................................ 45

*Monge v. Maya Magazines, Inc.*,
    688 F.3d 1164 (9th Cir. 2012).............................................. 34

*Narragansett Indian Tribe v. National Indian Gaming
    Commission*, 158 F.3d 1335 (D.C. Cir. 1998) ................... 55

*New Kids on the Block v. News American Publishing, Inc.*,
    971 F.2d 302 (9th Cir. 1992)......................................... 56, 57

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999) .................................................. 37

*Nintendo of America, Inc. v. Dragon Pacific International*,
    40 F.3d 1007 (9th Cir. 1994).............................................. 54

*North Jersey Media Group Inc. v. Pirro*,
    74 F. Supp. 3d 605 (S.D.N.Y. 2015).................................... 43

*Oracle America, Inc. v. Google Inc.*,
    750 F.3d 1339 (Fed. Cir. 2014) .......................................... 31

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*,
　684 F.2d 821 (11th Cir. 1982) ............................................................ 18

*Phoenix Entertainment Partners, LLC v. Rumsey*,
　829 F.3d 817 (7th Cir. 2016) ...................................................... 53, 54

*Powers v. Ohio*,
　499 U.S. 400 (1991) ............................................................................ 46

\* *Practice Management Information Corporation v. American*
　*Medical Association*,
　121 F.3d 516 (9th Cir. 1997) ............................ 24, 25, 26, 27, 32, 45, 47

*Rollins Environmental Services (NJ) Inc. v. U.S.*
　*Environmental Protection Agency*,
　937 F.2d 649 (D.C. Cir. 1991) ........................................................... 55

*Rosetta Stone Ltd. v. Google, Inc.*,
　676 F.3d 144 (4th Cir. 2012) ............................................................. 55

\* *Schnapper v. Foley*,
　667 F.2d 102 (D.C. Cir. 1981) ........................................................... 17

*Sessions v. Morales-Santana*,
　137 S. Ct. 1678 (2017) ....................................................................... 46

*Slep-Tone Entertainment Corporation v. Wired for Sound*
　*Karaoke & DJ Services, LLC*,
　845 F.3d 1246 (9th Cir. 2017) ........................................................... 53

*Society of the Transfiguration Monastery, Inc. v. Archbishop*
　*Gregory*, 685 F. Supp. 2d 217 (D. Mass. 2010 ................................... 37

*Stanley v. Georgia*,
　394 U.S. 557 (1969) ............................................................................ 49

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Stenograph L.L.C. v. Bossard Associates, Incorporated*,
144 F.3d 96 (D.C. Cir. 1998) .......................................... 15

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
610 F.3d 1171 (9th Cir. 2010) ........................................ 57

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000) ............................... 44

*United States ex rel. Miller v. Bill Harbert International
Construction, Inc.*, 608 F.3d 871 (D.C. Cir. 2010) ............. 43

*United States v. Fausto*,
484 U.S. 439 (1988) ..................................................... 23

*United States v. TDC Management Corporation, Inc.*,
827 F.3d 1127 (D.C. Cir. 2016) ...................................... 13

*Veeck v. Southern Building Code Congress International,
Inc.*, 293 F.3d 791 (5th Cir. 2003) .......... 27, 28, 29, 30, 32, 57, 12a, 13a

*Warren Publishing Company v. Spurlock d/b/a Vanguard
Productions*, 645 F. Supp. 2d 403 (E.D. Pa. 2009) ............ 36

*Whitman v. American Trucking Associations, Inc.*,
531 U.S. 457 (2001) ..................................................... 23

\* *Worldwide Church of God v. Philadelphia Church of God,
Inc.*, 227 F.3d 1110 (9th Cir. 2000) ............................ 41, 44

*Wynn Oil Co. v. Thomas*,
839 F.2d 1183 (6th Cir. 1988) ....................................... 52

*Zino Davidoff SA v. CVS Corporation*,
571 F.3d 238 (2d Cir. 2009) .......................................... 54

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**STATUTES**

Act of June 5, 1967, Pub. L. No. 90-23, 81 Stat. 54
 (codified at 5 U.S.C. § 552) ................................................................ 19
 5 U.S.C. § 552.................................................................................... 19
 5 U.S.C. § 552(a)(1) ............................................................................ 8

Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*:
 17 U.S.C. § 101.................................................................................. 17
 17 U.S.C. § 102(a) ...................................................................... 13, 19, 5a
 17 U.S.C. § 102(b) .............................................................................. 21
 17 U.S.C. § 105 ............................................................................. 16, 20
 17 U.S.C. § 106(1) ......................................................................... 15, 6a
 17 U.S.C. § 106(2) .............................................................................. 15
 17 U.S.C. § 106(3) ......................................................................... 15, 6a
 17 U.S.C. § 107.................................................................. 33, 34, 40, 41
 17 U.S.C. § 121................................................................................ 37, 6a
 17 U.S.C. § 201(a) .............................................................................. 20
 17 U.S.C. § 204 ................................................................................. 20
 17 U.S.C. § 302 ................................................................................. 20
 17 U.S.C. § 410(c) ........................................................................... 16, 8a

Lanham (Trademark) Act of 1946, 15 U.S.C. § 1051 *et seq.*:
 15 U.S.C. § 1114.................................................................................. 51
 15 U.S.C. § 1114(1)(a) ....................................................................... 53, 3a
 15 U.S.C. § 1125(a) ........................................................................ 50, 51, 4a

National Technology Transfer and Advancement Act of 1995,
 Pub. L. No. 104-113, 110 Stat. 775 (1996)................................. 6, 23, 1a

Pub. L. No. 102-245 (1991) ...................................................................... 22

**REGULATIONS**

1 C.F.R. § 51.3 (2015) .............................................................................. 8

1 C.F.R. § 51.5 (2015) .............................................................................. 8

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

1 C.F.R. § 51.7(a)(3) (2015) ........................................................................ 8

40 C.F.R. § 75, Appendix D (2012) .................................................... 27, 9a

39 Fed. Reg. 23,502 (June 27, 1974) ............................................... 20, 10a
   p. 23,538 ........................................................................................ 20, 10a

Office of Management and Budget Circular A-119,
   63 Fed. Reg. 8546 (Feb. 19, 1998) ............................................... 6, 11a
      p. 8554 ............................................................................... 6, 11a

Office of the Federal Register, Final Rule on Incorporation
   by Reference,
   79 Fed. Reg. 66,267 (Nov. 7, 2014) ............................................. 7, 12a
      p. 66,268 ..................................................................... 7, 29, 12a

Final Revision of Office of Management and Budget Circular
   A-119,
   81 Fed. Reg. 4673 (Jan. 27, 2016) .......................................................... 6

**CONSTITUTIONAL PROVISIONS**

U.S. CONSTITUTION article I, § 8, cl. 8 ...................................................... 24

**LEGISLATIVE MATERIALS**

H.R. REP. NO. 94-1476 (1976) ............................................................ 21, 13a

H.R. REP. NO. 104-390 (1995) .............................................................. 6, 14a

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY (10th ed. 2014) ............................................... 18

National Research Council, Standards, Conformity
   Assessment, and Trade: Into the 21st Century
   (National Academy Press 1995) ........................................................ 22

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Melville B. Nimmer, & David Nimmer,
   1 *Nimmer on Copyright* § 5.06[C] (1996)............................................25
   1 *Nimmer on Copyright* § 5.12 (2015) ...............................................29
   4 *Nimmer on Copyright* § 13.05(1)(b) (2017).....................................37
   5 *Nimmer on Copyright* § 19E.06 (2017)...........................................48

2 William F. Patry, *Patry on Copyright* (West 2015) ............................29

U.S. COPYRIGHT OFFICE, COMPENDIUM OF COPYRIGHT OFFICE
   PRACTICES (3d ed. 2017)............................................................ 18, 17a

# GLOSSARY OF ABBREVIATIONS

The following abbreviated terms are used in this brief:

| | |
|---|---|
| AERA | American Educational Research Association |
| ASHRAE | American Society of Heating, Refrigeration, and Air Conditional Engineers |
| ASTM | American Society of Testing and Materials |
| DOE | Department of Education |
| IBR | Incorporation by Reference |
| JA | Joint Appendix |
| NEC | NFPA's National Electric Code |
| NFPA | National Fire Protection Association |
| NTTAA | National Technology Transfer and Advancement Act of 1995 |
| OFR | Office of the Federal Register |
| OMB | Office of Management and Budget |
| PRO | Public.Resource.Org |
| SDO | Standards Development Organization |

# INTRODUCTION

Public.Resource.Org ("PRO") reproduced Plaintiffs' copyrighted standards and distributed those copies thousands of times without authorization.  PRO tries to justify its rampant infringement by arguing that copyright protection for standards evaporates the moment any government entity incorporates those standards by reference into regulations.

The district court correctly rejected PRO's arguments.  PRO's shrill rhetoric seeks to obscure that the copyrighted standards at issue (the "Works") are the result of a long-standing public-private partnership that Congress and federal agencies have recognized. Plaintiffs and other standards development organizations ("SDOs") invest substantial resources to create, distribute, and revise voluntary consensus standards for fire and electrical safety, consumer products, energy efficiency and sustainability, and other subjects.  Government agencies may, if they choose, incorporate these standards by reference into regulations.  This process saves budget-constrained legislative and administrative bodies the cost of developing standards themselves or otherwise acquiring the rights to display, reproduce, or distribute those

standards; promotes standards defined by excellence and collaboration rather than single-industry capture; fosters uniformity across jurisdictions; and recognizes SDOs' copyrights in the standards they develop.

Like other copyright owners, Plaintiffs recoup their investment by selling copies of their Works to builders, contractors, engineers, and others who use these Works as part of their business. Neither the voluminous summary judgment record—nor the pile of briefs submitted by PRO's amici—contains even one instance of a member of the public interested in the contents of an incorporated standard, but unable to access Plaintiffs' Works. That is because Plaintiffs make the Works available to the public in multiple ways—including by providing free access to the Works on their websites and, upon request, providing special copies to the visually impaired.

Without copyright protection, Plaintiffs and other SDOs cannot continue developing standards as they do now—and that unfortunate result would directly contravene federal, state, and local policies favoring the private development of those standards. Well-established copyright and trademark law precludes PRO from copying Plaintiffs'

standards and using their trademarks without authorization, and the district court's decision correctly applying that law should be affirmed.

## JURISDICTIONAL STATEMENT

Appellees agree with appellants' jurisdictional statement.

## STATEMENT OF ISSUES

(1)     Are Plaintiffs' copyrights destroyed the moment any governmental entity, at any level, anywhere in the country, incorporates Plaintiffs' Works by reference in regulations?

(2)     Did the district court correctly hold that PRO infringed Plaintiffs' registered trademarks by affixing those marks to counterfeit copies with multiple errors, and passing those copies off as Plaintiffs' publications?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations that are not already included in PRO's addendum, and hereby incorporated, are reproduced in an addendum to this brief.

## STATEMENT OF THE CASE

### A.  Plaintiffs Develop Standards To Promote Health, Safety, And Other Public Benefits

Plaintiffs are private, non-profit SDOs, whose public-service missions include promoting public health and safety and encouraging environmental sustainability.  Dkt-118-11 ¶¶3, 11; Dkt-118-8 ¶4; Dkt-118-10 ¶2 (JA396-JA397; JA365; JA380).

"Standards" encompass a range of works containing, among other things, product specifications, installation methods, methods for manufacturing and testing materials, and recommended practices to ensure safety or efficiency.  Dkt-118-11 ¶6 (JA397).  Standards advance public safety, ensure compatibility across products and services, facilitate training, and spur innovation.  Dkt-118-11 ¶¶5, 11, 13; Dkt-118-8 ¶4; Dkt-118-10 ¶2 (JA397-JA398; JA365; JA380).  Plaintiffs' purpose in developing their standards is not primarily to have them incorporated into government regulations, Dkt-118-11 ¶¶13-17; Dkt-118-8 ¶¶10-12; Dkt-118-10 ¶3 (JA398; JA366-JA367; JA380-JA381), but to have them used by private industry and other non-governmental users to address technical issues or problems in many industrial and commercial fields—including construction, consumer products,

petroleum products, and the energy and water industries, Dkt-118-4 ¶19; Dkt-118-6 ¶16; Dkt-118-11 ¶¶5, 13; Dkt-118-8 ¶¶4, 11; Dkt-118-11 ¶¶8, 10 (JA161; JA169-JA170; JA397-JA398; JA365-JA366).  For example, Plaintiffs' Works include standards for distilling petroleum products at atmospheric pressure and for measuring density of liquids by Bingham Pycnometer.  Dkt-118-7, Exs. 6, 9 (JA277-JA305; JA333-JA338).

## B.    Governments Incorporate Plaintiffs' Standards To Promote The Public Good

For over a century, all levels of government—federal, state, and local—have incorporated by reference privately developed standards. Dkt-118-11 ¶¶4, 5, 15; Dkt-118-8 ¶¶4, 10; Dkt-118-10 ¶3 (JA396-JA398; JA365-JA366; JA380-JA381).  In its report on the National Technology Transfer and Advancement Act of 1995 ("NTTAA"), the House Science Committee explained "the crucial role standards play in all facets of daily life and in the ability of the nation to compete in the global marketplace."

> The United States, unlike the federalized standards system of most other countries, relies heavily on a decentralized, private sector-based, voluntary consensus standards system ….  This unique consensus-based voluntary system has

> served us well for over a century and has
> contributed significantly to United States
> competitiveness, health, public welfare, and
> safety.

H.R. REP. NO. 104-390, pt. VII, at 23-24 (1995).

Federal law encourages incorporation by reference. The NTTAA *requires* federal agencies to use privately developed standards whenever possible. Pub. L. No. 104-113, § 12, 110 Stat. 775, 782-83 (1996). The Office of Management and Budget ("OMB") has explained that incorporation by reference (i) saves government the cost of developing standards on its own; (ii) provides incentives to establish standards serving national needs; (iii) promotes efficiency and economic competition through harmonized standards; and (iv) furthers the federal policy of relying on the private sector to meet government needs for goods and services. OMB Circular A-119, 63 Fed. Reg. 8546, 8554 (Feb. 19, 1998).[1]

When a standard is published in an agency document (as opposed to being incorporated by reference), OMB advises that "your agency must observe and protect the rights of the copyright holder." *Id.* at

---

[1] That Circular was renewed in 2016. Final Revision of OMB Circular A-119, 81 Fed. Reg. 4673 (Jan. 27, 2016), Dkt-169-1 (JA2007-JA2050).

8555. Permitting SDOs to hold copyrights and charge for the use of their works is essential: "If we required that all materials IBR'd into the CFR be available for free, that requirement would compromise the ability of regulators to rely on voluntary consensus standards, possibly requiring them to create their own standards, which is contrary to the NTTAA and the OMB Circular A-119." *See* OFR, Final Rule on Incorporation by Reference, 79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014).

## C.    Copyright Protection Funds The Creation Of Plaintiffs' Standards

Plaintiffs spend millions of dollars each year creating and publishing standards. Dkt-118-11 ¶35; Dkt-118-12, Ex. 1 ¶¶71, 76 (JA400; JA443, JA446). The expenses arise from encouraging collaboration and convening technical committee meetings; collecting research and data; employing technical experts; gathering public input; and editing, producing, distributing, and promoting the completed standards. Dkt-118-11 ¶34; Dkt-118-8 ¶18 (JA400; JA368).

The ability to copyright these standards is essential. Plaintiffs generate the majority of their revenues (sometimes two-thirds or more) from selling copies of their standards. Dkt-118-11 ¶38; Dkt-118-8 ¶46; Dkt-118-12, Ex. 1 ¶22 (JA401; JA375; JA420-JA421). It is undisputed

that without the ability to copyright "all of their standards, [Plaintiffs]

will face significant difficulty raising the necessary revenue to continue

producing high-quality voluntary consensus standards."  Dkt-175 at 28;

Dkt-118-12, Ex. 1 ¶¶6, 153, 163 (JA2086; JA415-JA416; JA478; JA482).

### D.    Plaintiffs' Standards Are Accessible Through Multiple Channels

Federal law regulates the incorporation by reference of privately

developed standards and requires that they be "reasonably available to

the class of persons affected."  5 U.S.C. § 552(a)(1); 1 C.F.R. § 51.7(a)(3)

(2015).  The regulations specify that (i) a copy of the incorporated

material must be on file with the Office of the Federal Register, and

(ii) the regulations incorporating such material must state the ways

that material is reasonably available to interested parties.  1 C.F.R. §§

51.3, 51.5 (2015).

Plaintiffs' Works are readily available to the public.  As PRO

concedes, they can be accessed by visiting the National Archives or

public libraries.  Br. 7-8.  In addition, Plaintiffs make their standards

available in multiple formats through multiple distribution channels,

including for no charge over the Internet.

First, anyone who wants to read Plaintiffs' Works can do so free of charge simply by going to Plaintiffs' websites and viewing the Works in read-only format.  Dkt-118-7 ¶61, Ex. 17; Dkt-118-8 ¶45; Dkt-118-10 ¶19 (JA181; JA339-JA343; JA374-JA375; JA386).

Second, anyone can purchase copies of the standards in hard copy or digital format.  Dkt-118-11 ¶44; Dkt-118-8 ¶44; Dkt-118-10 ¶17 (JA402; JA374; JA385).  Plaintiffs sell copies of their standards at reasonable cost, particularly given their nature as technical works for industry professionals.  Dkt-118-11 ¶45 (JA402) (ASTM sells its standards for $38-$89 per work); Dkt-118-8 ¶44 (JA374) (NFPA sells standards for $39-$105); Dkt-118-10 ¶18 (JA385) (ASHRAE standards are typically between $25 and $120, with none above $200).  Some standards are also offered on a subscription basis at a discount.  Dkt-118-10 ¶18 (JA385).

PRO produced no evidence that anyone has ever been unable to access Plaintiffs' Works to comply with a government regulation.  Dkt-118-12, Ex. 2 (71:3-77:24) (JA532-JA538).  The undisputed evidence shows that people who rely on standards for their work can obtain them

with little difficulty.  Dkt-118-5 ¶10; Dkt-118-11 ¶¶44-54; Dkt-118-10

¶¶18-20 (JA165; JA402; JA385-JA386).

### E. PRO Started Infringing Plaintiffs' Copyrights And Trademarks After Being Unable To Effect Legislative Change

PRO disagrees with Congress's judgment that standards do not

lose their copyright protection when government bodies incorporate

them by reference.  And PRO vigorously advocated before Congress and

various offices of the executive branch, including the Office of the

Federal Register ("OFR") and the Administrative Conference of the

United States, to change the law to strip incorporated standards of their

copyright protection.  Dkt-118-12, Ex. 3 (232:14-233:5); Dkt-118-7 ¶66

(JA679-JA680; JA181-JA182).  Those efforts failed.  Dkt-118-12, Ex. 3

(232:14-234:8) (JA679-JA681).  Indeed, federal agencies have repeatedly

told PRO that incorporation by reference does not extinguish the

incorporated standards' copyright.  *See* Dkt-118-12, Ex. 10 (JA757-

JA765) (letters from Department of Interior; Department of Housing

and Urban Development; and Consumer Product Safety Commission).

Unable to change the law through proper channels, PRO took

matters into its own hands and posted copies of Plaintiffs' Works on its

website and on the Internet Archive, a searchable website that makes copies of published works available for free in digital formats. PRO copied the Works either by scanning them and using optical character recognition software to convert images of the scanned pages into text, Dkt-118-12, Ex. 2 (156:21-159:6) (JA549-JA552), or by having untrained individuals retype and reformat the text into HTML, Dkt-118-12, Ex. 2 (159:19-160:7; 162:13-163:17; 184:22-185:4) (JA552-JA553; JA554-JA555; JA565-JA566).[2]

Unsurprisingly, PRO's copying methods introduced errors into the HTML and PDF versions of the materials posted on its website. Dkt-118-12, Ex. 3 (127:4-139:8; 147:19-148:1); Dkt-118-12, Ex. 16 (JA651-JA663; JA668-JA669; JA771-JA800) (PDF version of ASTM D86-07 with errors); Dkt-118-13, Ex. 29 (JA906-JA929) (HTML version of ASTM D86-07 with errors); Dkt-118-8 ¶54 (JA376-JA378) (describing errors in NFPA's 2011 NEC including erroneously representing a measurement in inches ("in") rather than meters ("m")). PRO nonetheless placed Plaintiffs' trademarks on those electronic files and

---

[2] Examples of Plaintiffs' Works that PRO posted in PDF format and in HTML format are available at Dkt-118-12, Ex. 16 and Dkt-118-13, Ex. 29 (JA771-JA800; JA906-JA929).

advertised them as authentic versions of Plaintiffs' Works. Dkt-118-12, Ex. 16 (JA771-JA800) (ASTM trademarks); Dkt-118-13, Ex. 25 (JA810-JA813) (ASHRAE trademarks); and Ex. 26 (JA814-JA817) (NFPA trademarks); Dkt-118-13, Exs. 27-28 (JA818-JA905).

### F.    PRO's Actions Harmed Plaintiffs

PRO posted Plaintiffs' Works so they can be copied, downloaded, or printed by anyone for free. As a result, Plaintiffs' Works were downloaded tens of thousands of times from Public.Resource.Org and Internet Archive websites. Dkt-118-14, Exs. 38-39 (JA974-JA995). The 2011 National Electrical Code alone was downloaded 30,350 times from the Internet Archive between 2013 and February 2015. Dkt-118-14, Ex. 39 (JA992-JA993).

Since PRO began posting the National Electrical Code online, NFPA's sales have declined significantly. Dkt-118-12, Ex. 1 ¶133 (JA469-JA471). PRO admits it does not know how third parties are using the Works accessed from its websites, so it is impossible to assess the full scope of the damage—including immeasurable harm to Plaintiffs' goodwill from PRO's unauthorized use of their trademarks

and posting flawed versions of Plaintiffs' Works. Dkt-118-12, Ex. 3 (72:12-16; 73:25-76:5) (JA627; JA628-JA631).

PRO also openly attempted to supplant Plaintiffs' authorized distribution channels. For example, PRO tried to drive traffic to its website by using search-engine optimization to appear higher than Plaintiffs' websites in Google search results. Dkt-118-13, Ex. 34 (JA972-JA973). One of PRO's stated goals was to "have more users" than the "SDO-provided websites," and "to be number 1 in the marketplace." Dkt-118-13, Ex. 33 (JA968). PRO's actions have already emboldened others' copying and distributing Plaintiffs' Works. Dkt-118-3, Exs. J, K; Dkt-118-12, Ex. 12 (JA152-JA157; JA766-JA770).

## STANDARD OF REVIEW

This Court reviews the summary judgment ruling de novo, *Clemente v. Federal Bureau of Investigation*, 867 F.3d 111, 116 (D.C. Cir. 2017), and evidentiary rulings on expert testimony for abuse of discretion, *United States v. TDC Management Corporation, Inc.*, 827 F.3d 1127, 1133 (D.C. Cir. 2016).

## SUMMARY OF ARGUMENT

It is undisputed that copyright protects Plaintiffs' Works as soon as they are fixed in a "tangible medium of expression." 17 U.S.C.

§ 102(a). Nothing in the Copyright Act or controlling precedent destroys copyright protection when a government body incorporates a standard by reference. Nor does the fair use defense excuse PRO's wholesale, commercial copying, public display, and mass distribution of Plaintiffs' Works. And there is no "constitutional conflict" to avoid because the Copyright Act already accommodates any constitutional concerns.

PRO also systematically violated the Lanham Act by passing off its counterfeit versions of Plaintiffs' Works, affixing Plaintiffs' own marks onto PRO's versions, and marketing PRO's copies as genuine. PRO's versions contained numerous errors—no trivial matter with public safety at stake—and created the misleading impression that PRO was distributing genuine, reliable copies of Plaintiffs' Works. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), on which PRO relies, only confirms PRO's systematic trademark infringement.

The policy concerns PRO raises about lack of access are not implicated in this case, where it is undisputed that Plaintiffs' Works are widely available to the public. There is no evidence that anyone has

- 14 -

ever been unable to comply with a federal regulation due to lack of access to one of Plaintiffs' Works.  By copying Plaintiffs' Works and making flawed versions of those Works available to the public for free, PRO did not fulfill an unmet need; it trampled on Plaintiffs' intellectual property rights.  The district court correctly granted Plaintiffs summary judgment, and this Court should affirm.

## ARGUMENT

## I.    PRO Infringed Plaintiffs' Copyrights

### A.    Plaintiffs Established A Prima Facie Case Of Infringement

"A plaintiff seeking to establish copyright infringement must prove '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 99 (D.C. Cir. 1998) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  Plaintiffs met their burden on both elements.

It is undisputed that PRO exercises Plaintiffs' exclusive rights without authorization, including the rights to reproduce, publicly display, make derivative works of, and distribute the Works.  17 U.S.C. § 106(1), (2), (3); Br. 3 (admitting that PRO posted Plaintiffs' Works on

the Internet).  Persons who want to exercise these rights must have authorization from the copyright owner (Plaintiffs) to do so.  PRO does not.

PRO half-heartedly disputes Plaintiffs' ownership, but Plaintiffs' copyright registration certificates are presumptive proof of ownership and validity.  17 U.S.C. § 410(c).  And PRO cannot dispute that Plaintiffs have a sufficient ownership in the copyrights to claim infringement, based on their employees' contributions to the Works. *Davis v. Blige*, 505 F.3d 90, 98-99 (2d Cir. 2007).[3]

Abandoning the many other copyright-ownership arguments PRO made below, PRO only argues now that this Court should remand for the district court to consider whether the Works are "work[s] of the United States Government" and thus ineligible for copyright protection under 17 U.S.C. § 105.  Br. 49-50.  That argument fails for at least two reasons.

---

[3] *See* Dkt-118-7 ¶¶15-39, Exs. 5-9; Dkt-118-8 ¶¶38-40; Dkt-118-12, Ex. 6 (54:19-56:12; 66:20-67:12; 69:2-18); Dkt-118-10 ¶¶9-11; Dkt-118-12, Ex. 7 (35:23-38:2; 97:13-98:19) (JA174-JA177; JA196-JA338; JA373; JA727-JA729; JA734-JA735; JA737; JA382-JA383; JA746-JA749; JA750-JA751).

First, PRO waived this argument.  In its summary judgment briefing, PRO argued only that, to the extent a federal government employee participating in a standard-setting process made a particular contribution, that *contribution* would not be copyrightable.  PRO's Mem. ISO Mot. for Summ. J. at 54 (Dkt-121-1).  PRO never argued that mere participation in the process by a federal employee made the *entire* resulting standard non-copyrightable.  That argument is therefore waived.  *See Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017) ("'legal theories not asserted'" in the district court "'ordinarily will not be heard on appeal'").

Second, the argument is baseless.  A "work of the United States Government," which is ineligible for copyright protection, "is a work prepared by an officer or employee of the United States Government as part of that person's official duties."  17 U.S.C. § 101.  PRO never identified any portion of a Work authored by a federal employee, let alone proved that any authorship was part of the employee's official duties.  Moreover, the case law unsurprisingly forecloses PRO's extreme position that a federal employee's mere participation renders the whole work non-copyrightable.  *See Schnapper v. Foley*, 667 F.2d 102, 106, 108

(D.C. Cir. 1981) (Sections 101 and 105 did not prohibit copyright protection for a television station's works even though the federal government commissioned them and "exercise[d] some supervision over the scripts."); *see also* U.S. COPYRIGHT OFFICE, COMPENDIUM OF COPYRIGHT OFFICE PRACTICES (3d ed. 2017) ("Copyright Office Compendium") § 313.6(C)(1) (a U.S. government employee's work may be registered if "prepared at that person's own volition and outside his or her official duties, even if the subject matter focuses on the author's work for the government").[4]

## B.    Incorporation By Reference Does Not Destroy Plaintiffs' Copyright Protection

Because Plaintiffs established a *prime facie* case of infringement, the burden shifted to PRO to show a disputed question on at least one defense to infringement.  *See Original Appalachian Artworks, Inc. v.*

---

[4] PRO relies on the Copyright Office's policy of not registering "government edict[s]".  Br. 26 (citing U.S. Copyright Office Compendium § 313.6(c)(2)).  But Plaintiffs' Works are privately developed standards, not government "edicts."  *See* BLACK'S LAW DICTIONARY (10th ed. 2014) ("edict[s]" are statements "issued by the sovereign of a country").  And the Copyright Office registered Plaintiffs' standards.  Dkt-118-7 ¶¶5-10 & Exs. 1-4; Dkt-118-3 ¶¶2-3 & Exs. A-B; Dkt-118-10, Exs. 3-5 (JA173; JA183-JA195; JA144-JA145; JA148-JA151; JA387-JA395).

*Toy Loft, Inc.*, 684 F.2d 821, 826 (11th Cir. 1982) ("burden of production

shifts to the defendant to introduce evidence of invalidity").

PRO does not dispute that Plaintiffs' Works are protected by

copyright once "fixed in any tangible medium of expression."  17 U.S.C.

§ 102(a).  PRO instead argues that a single act of incorporation by

reference by any governmental entity either divests the copyright or

excuses any infringement of the copyright under the fair use defense.

Not so.

### 1.    Nothing In The Copyright Act Destroys Copyright Upon Incorporation By Reference

When Congress enacted the 1976 Copyright Act, it was well aware

that copyrighted works were routinely incorporated by reference into

federal, state, and local law.  *Hall v. United States*, 566 U.S. 506, 516

(2012) (courts should "assume that Congress is aware of existing law

when it passes legislation") (internal quotation marks omitted).  Ten

years earlier, Congress itself had authorized federal agencies to

incorporate works by reference into federal regulations—and the

agencies did so with Plaintiffs' standards.  *See* Act of June 5, 1967, Pub.

L. No. 90-23, § 552, 81 Stat. 54, 54 (codified at 5 U.S.C. § 552); *see also*

39 Fed. Reg. 23,502, 23,538 (June 27, 1974) (incorporating by reference the 1971 edition of NFPA's NEC).

Nothing in the 1976 Copyright Act suggests that Congress intended to terminate copyright protection for standards incorporated by reference in statutes or regulations. The Act provides that copyright in a work "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). And the Act enumerates how copyright can be divested, *e.g.*, through the transfer or expiration of copyrights, § 204; § 302, but it never suggests that a copyright is terminated or divested by the work being incorporated by reference. Especially given Congress's awareness of the widespread practice of incorporation, Congress easily could have provided that incorporated standards lose their copyright protection. But Congress did not—and PRO's attempt to remake copyright law according to its own policy preferences must be rejected.

PRO points to § 105 as proof that Congress intended "the *operating documents of a democratic government [to be] in the public domain*." Br. 28 n.7. But § 105's text expressly applies *only* to government-authored works. If anything, § 105 supports the opposite

inference with respect to copyrighted standards. Congress could easily have provided that incorporated standards be treated like government-authored works for copyright purposes. But Congress did not. Indeed, as the House Report explains, "publication or other use by the Government of a private work *would not affect its copyright protection in any way*." H.R. REP. NO. 94-1476, at 60 (1976) (emphasis added).

PRO also argues that § 102(b) divests copyright in standards incorporated by reference. *See* Br. 27. Not so. That statute codifies the Supreme Court's decision in *Baker v. Selden*, 101 U.S. 99 (1879), and the general rule that copyright protects expressions of ideas but not ideas themselves. In *Baker*, the plaintiff obtained a copyright for a book that described a "system of book-keeping," and included forms "illustrating the system and showing how it is to be used and carried out in practice." *Id.* at 100. The Court held that the plaintiff could copyright the book "as a book"—but not the practice of "the art described therein": "The use of the art is a totally different thing from a publication of the book explaining it." *Id.* at 102, 104.

Consistent with *Baker* and § 102(b), Plaintiffs' copyrights do not bar anyone from practicing the tests or standards contained therein.

Nor do they bar anyone from creating their own original expression to describe the testing methods described by the standards.

### 2. Congress Has Endorsed Incorporation By Reference

In 1991, Congress enacted Public Law 102-245, requesting that the National Research Council study standards development. *See* National Research Council, Standards, Conformity Assessment, and Trade: Into the 21st Century vii (National Academy Press 1995), http://www.nap.edu/read/4921/chapter/1. The resulting study contained a detailed overview of the U.S. standards-development system and specifically noted that many standards developers "offset expenses and generate income through sales of standards documents, *to which they hold the copyright*. For many SDOs, publishing is a significant source of operating revenue." *Id.* at 32 (emphasis added). The study concluded that the "U.S. standards development system serves the national interest well" by "support[ing] efficient and timely development of product and process standards that meet economic and public interests." *Id.* at 157.

The study recommended that Congress pass a law to promote federal agencies' use of privately developed, voluntary consensus

standards.  Congress responded by enacting the National Technology

Transfer and Advancement Act of 1995, Pub. L. No. 104-113, § 12(d),

110 Stat. 775 (1996) (NTTAA).  The Act declares that "all Federal

agencies and departments shall use technical standards that are

developed or adopted by voluntary consensus bodies, using such

technical standards as a means to carry out policy objectives or

activities." *Id.* at 783.

　　As the district court recognized, "[i]f Congress intended to revoke

the copyrights of such standards when it passed the NTTAA, or any

time before or since, it surely would have done so expressly...." Dkt-175

at 22 (JA2080) (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S.

457, 468 (2001) ("Congress ... does not alter the fundamental details of a

regulatory scheme in vague terms or ancillary provisions—it does not ...

hide elephants in mouseholes."); *United States v. Fausto*, 484 U.S. 439,

453 (1988) ("[It] can be strongly presumed that Congress will

specifically address language on the statute books that it wishes to

change.").

### 3. The Weight Of Authority Recognizes That Incorporation By Reference Does Not Automatically Destroy Copyright Protection

Decisions by other appellate courts that have considered the question further confirm that standards like those here do not lose their copyright protection by incorporation by reference.

In *Practice Management*, the Ninth Circuit considered a copyrighted coding system developed by the American Medical Association ("AMA") to help doctors and other health care workers identify medical procedures. *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 517 (9th Cir. 1997). The Health Care Financing Association "adopted regulations requiring applicants for Medicaid reimbursement to use" the AMA's codes for each procedure. *Id.* at 518. An AMA competitor sought to publish those codes, making the same argument PRO makes here: the code "became uncopyrightable law when HCFA adopted the regulation mandating [its] use." *Id.* The court rejected that argument, holding that the code continued to be protected by copyright. *Id.* at 520.

Emphasizing copyright's purpose under the Constitution to "promote the progress of science and the useful arts" (U.S. CONST. art. I,

§ 8, cl. 8), the court reasoned that "'[t]o vitiate copyright, in such circumstances, could, without adequate justification, prove destructive of the copyright interest, in encouraging creativity,' a matter of particular significance in this context because of 'the increasing trend toward state and federal adoptions of model codes.'"  121 F.3d at 518 (quoting 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 5.06[C], at 5-92 (1996)).

The *Practice Management* court then analyzed *Banks v. Manchester*, 128 U.S. 244 (1888), on which PRO relies.  In *Banks*, the Supreme Court held that judges do not hold copyright in their opinions because (1) "the public owns the opinions because it pays the judges' salaries" and (2) "due process require[s] free access to the law." *Practice Mgmt.*, 121 F.3d at 518-19 (citing *Banks*, 128 U.S. at 253).  As the *Practice Management* court explained, *Banks*'s first justification does not apply to privately developed standards because "copyrightability of the [code] provides the economic incentive for the [standards development organization] to produce and maintain [it]."  *Id.* at 518. And *Banks'*s second rationale (due process) arises only if there is "evidence that anyone wishing to use the [code] has any difficulty

obtaining access to it." *Id.* at 519. Because anyone could easily access

the code in *Practice Management* by purchasing it from the AMA, there

was no basis for refusing to recognize copyright. *Id.* at 518. The same

is true here, where there is no evidence anyone wishing to use

Plaintiffs' Works has had any difficulty obtaining access.

Similarly, in *CCC Information Services, Inc. v. Maclean Hunter

Market Reports, Inc.*, 44 F.3d 61 (2d Cir. 1994), the Second Circuit held

that state regulations' incorporation by reference of the Red Book,

which provides automobile valuations, did not destroy the copyright in

that work. *Id.* at 74 & n.30 (free access to copyrighted work

incorporated as "legal standard for valuation" would "prove destructive

of the copyright interest in encouraging creativity") (internal quotation

marks omitted).

PRO's arguments for distinguishing *Practice Management* and

*CCC* are unpersuasive. First, PRO contends that the works in these

cases did not "function as rules and principles." Br. 36. That is

incorrect. In *Practice Management*, HCFA's regulations "require[d]" all

medical providers seeking Medicare reimbursement to use the

copyrighted billing codes, and states to implement similar regulations

for Medicaid, making the codes "the exclusive medical procedure coding system." 121 F.3d at 518. In *CCC*, the state's regulations "require[d]" all auto insurers to pay claims according to the valuations in the copyrighted work or an average of the valuations in the copyrighted work and another similar work (unless using another approved valuation method). 44 F.3d at 73. Moreover, like in *CCC*, Plaintiffs' Works include standards that are one of several ways to comply with the relevant regulations. *See* 40 C.F.R. § 75, Appendix D § 2.2.6 (2012) (referencing ASTM D1217-93(98) as one of many methods for complying with regulation). Second, PRO argues that the *Practice Management* defendant copied the AMA's work, not "the government's own document (the HCPCS)." Br. 36. But the same is true here. PRO copied and posted Plaintiffs' Works, not government documents. Dkt-118-12, Ex. 2 (156:21-157:1, 158:22-159:6, 274:17-275:10, 280:14-282:11, 288:9-290:16); Dkt-118-12, Ex. 23; Dkt-118-12, Ex. 3 (199:21-201:5); Dkt-118-16, Ex. 44 (JA549-JA550, JA551-JA552, JA587-JA588, JA592-JA594, JA595-JA597; JA805-JA809; JA673-JA675; JA996-998).

Unable to distinguish *Practice Management* and *CCC*, PRO relies on the Fifth Circuit's sharply divided decision in *Veeck v. Southern*

*Building Code Congress International, Inc.*, 293 F.3d 791, 794 (5th Cir. 2003) (*en banc*).  But *Veeck* is inapposite, and unpersuasive besides. The *Veeck* plaintiff created a set of five "model building codes," which were enacted into law.  *Id.* at 793-94.  The defendant posted the codes online.  *Id.* at 793.  By a 9-6 vote, the *en banc* Fifth Circuit held that under that case's circumstances, when the model codes were "adopted by a legislative body and bec[a]me 'the law'," they "enter[ed] the public domain and [were] not subject to the copyright holder's exclusive prerogatives."  *Veeck*, 293 F.3d at 793.

The Fifth Circuit was careful, though, to distinguish the sorts of standards created by Plaintiffs here, who submitted an amicus brief in *Veeck*.  It expressly did *not* hold that "copyrights may be vitiated simply by the common practice of governmental entities' incorporating their standards in laws and regulations."  *Id.* at 803-04.  The court distinguished between "extrinsic standards"—which require citizens "to consult or use a copyrighted work in the process of fulfilling their obligations"—and "the wholesale adoption of a model code."  *Id.* at 804-05 (finding no conflict with *CCC* and *Practice Management*).  The court noted that the model codes at issue there (unlike here) served "no other

purpose than to become law," and acknowledged that when standards also have other uses, such as being "used by insurance companies and other non-governmental uses," they do not lose their copyright when incorporated by reference.  *Id.* at 805.

Further, the six dissenters, the OFR, and leading treatises all confirm that PRO's expansive reading of *Veeck* to reach works like those at issue here should be rejected (or even argue that *Veeck* itself was wrongly decided).  *See, e.g.*, 79 Fed. Reg. at 66,268 (noting that "recent developments in Federal law, including the *Veeck* decision … have not eliminated the availability of copyright protection for privately developed codes and standards referenced in or incorporated into federal regulations.  Therefore, we agreed with commenters who said that when the Federal government references copyrighted works, those works should not lose their copyright."); 2 William F. Patry, *Patry on Copyright* § 4.84 (West 2015) (arguing that the *Veeck* majority opinion is "deeply flawed" and "should be disapproved of"); 1 *Nimmer on Copyright* § 5.12 (2015) (noting that the *Veeck* majority "took pains to emphasize the limits of its holding" "to allay the fear of amici standards-writing

organizations"). PRO offers no persuasive reason for this Court to depart from that consensus.

### 4. The Merger Doctrine Does Not Preclude Copyright Protection for Plaintiffs' Works

PRO cites *Veeck* for the proposition that Plaintiffs' standards "merge[]" with law when incorporated by reference and therefore lose copyright protection. Br. 32 (citing *Veeck*, 293 F.3d at 801). The *Veeck* decision (which cites no authority on this point) applies the merger doctrine incorrectly.[5]

The merger doctrine is "a pragmatic one, which also keeps in consideration 'the preservation of the balance between competition and protection reflected in the patent and copyright laws.'" *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1253 (3d Cir. 1983)

---

[5] PRO's reliance on *Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458 (5th Cir. 1990), is misplaced. The plaintiff obtained a U.S. Geographical Survey map, drew a line showing that exact route of a particular planned pipeline, and claimed that the map with the line was his copyrighted expression. The court correctly rejected that claim, because at the moment of claimed creation there was only one way to draw that line—in accordance with the plaintiff's proposed plan. *Id.* at 1464-65 ("the lines Kern River created express in the only effective manner the idea of the pipeline's location"). Contrary to PRO's suggestion, the court's decision had nothing to do with FERC's approval of the route, which had not even happened when the plaintiff drew its line. *See* Br. 33; *Kern River*, 899 F.2d at 1460.

(quoting *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir. 1971)).  It balances those competing considerations by asking whether, at the time a work is created, there is essentially one way (or an extremely limited number of ways) to express that idea.  The merger doctrine does not divest copyright protection from an author whose choices were not so limited *at the time he or she created their work*.  The fact that a work, post-creation, becomes a popular or even standard way of expressing an idea does not bring the merger doctrine into play to divest the original copyright.  Applying the merger doctrine in that situation would undermine copyright laws' incentives for creating new expressive works.  *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1372 (Fed. Cir. 2014) (merger doctrine did not divest copyright protection for computer program that had become de facto industry standard post-creation).  *Cf. Atari Games Corp. v. Oman*, 888 F.2d 878, 885 (D.C. Cir. 1989) (reviewing Register's decision to deny copyright registration of Atari videogame and explaining that "a large variety of 'arrangements' or designs might have been devised in lieu of those featured in BREAKOUT, *i.e.*, in place of the objects represented").

*Practice Management* and *CCC* both correctly held that the merger doctrine did not divest the copyright in the underlying works that later were incorporated by reference. *Practice Mgmt.*, 121 F.3d at 520 n.8 (rejecting merger defense because copyright did not prevent "competitors from developing comparative or better coding systems"); *CCC*, 44 F.3d at 68-73 (analyzing the underlying considerations for merger and finding it should not apply to works incorporated by reference).

Plaintiffs were not constrained to write only one particular type of standard and there is no lack of competition in the standards development market, as shown by the unrefuted fact that different SDOs write their own expressive standards in different ways. Dkt-118-4 ¶¶17, 22; Dkt-118-6 ¶13; Dkt-118-11 ¶30; Dkt-118-12, Ex. 7 (31:6-32:8) (JA161-JA162; JA169; JA400; JA744-JA745). The *Veeck* court, however, ignored the fact that when the plaintiff there created the model codes, they were not the only way to express the underlying ideas. Hence, *Veeck*'s analysis of merger is either *ipse dixit* or a misplaced recycling of its mistaken conclusions about the effect of incorporation by reference. *See Veeck*, 293 F.3d at 807 (Higginbotham,

J., dissenting) (objecting to the majority's discussion of merger as "tautological" and "a restatement of the conclusion that adopting the codes invalidated the copyright, not an independent reason why that is so").[6]  This Court should reject PRO's invitation to commit the same error.

### C.    PRO Failed To Meet Its Burden To Show Fair Use

Fair use is an affirmative defense to infringement that PRO bears the burden to prove.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994).  The fair use statute, 17 U.S.C. § 107, calls for the

---

[6] PRO also relies on dicta from *Building Officials & Code Adm. v. Code Technology, Inc.* ("BOCA"), 628 F.2d 730 (1st Cir. 1980).  Br. 22-23, 29-30.  But the First Circuit expressly left "the matter open for consideration by the district court," recognizing that SDOs "serve an important public function" and that "the rule denying copyright protection to judicial opinions and statutes grew out of a much different set of circumstances than do these technical regulatory codes."  *BOCA*, 628 F.2d at 736.  More recently, a district court in the First Circuit followed *Practice Management* and *CCC* in holding that "the balance of competing interests at stake in such cases favors preserving copyright protection for works incorporated by reference into public enactments." *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 186 F. Supp. 2d 1, 22 (D. Mass. 2002), *aff'd on other grounds by John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 39 (1st Cir. 2003) (recognizing that following the *BOCA* decision, the question of copyright protection for works incorporated by reference remains open in that circuit).

consideration of four factors, each of which weighs strongly against

PRO's defense.

### 1. PRO's Copying And Distribution Of Plaintiffs' Works Is Substitutional, Not Transformative

The first § 107 factor ("the purpose and character of the use") asks

"whether the work adds something new, with a further purpose or

different character, altering the first with new expression, meaning or

message." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir.

2014) (citations and internal quotation marks omitted). "[I]t asks, in

other words, whether and to what extent the new work is

'transformative.'" *Campbell*, 510 U.S. at 579. Courts have uniformly

recognized that a fair use defense fails if the defendant's use simply

results in "providing the public with a substantial substitute for matter

protected by the [p]laintiffs' copyright interests in the original works."

*Authors Guild v. Google, Inc.*, 804 F.3d 202, 207 (2d Cir. 2015); *Monge v.*

*Maya Magazines, Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012).

The purpose and character of PRO's copying is plainly

substitutional. Stripped of rhetoric, PRO's purpose is to enable

members of the public to obtain copies of Plaintiffs' Works. Dkt-118-12,

Ex. 3 (85:1-89:10, 63:1-64:3, 66:13-68:4, 76:14-77:8, 80:20-86:15); Dkt-

118-13, Exs. 30-32 (JA638-JA642, JA620-JA621, JA623-JA625, JA631-JA632, JA633-JA639; JA930-JA955).  That is the *same* purpose that Plaintiffs have in distributing their Works, whether offered for purchase or for free through their reading rooms.  Dkt-118-8 ¶45; Dkt-155-8, Ex. 4 (110:9-23); Dkt-155-8, Ex. 7 (10:23-11:8) (JA374-JA375; JA1984; JA1995-JA1996).

PRO's contrary arguments fail to create a triable issue on transformative use.  First, PRO claims that its systematic copying and mass public distribution of Plaintiffs' Works "fits *all* [of § 107's] preamble's characteristic purposes."  Br. 41.  That is empty rhetoric.  PRO makes "duplicate copies" and posts them online for members of the public to freely download.  Dkt-175 at 35 (JA2093).  Nowhere in that process does PRO add a scintilla of criticism, commentary, reporting, or scholarship, let alone anything new or otherwise imbuing the work with new meaning.  *See Campbell*, 510 U.S. at 578-79.

Second, PRO argues that it distributes Plaintiffs' Works "to make the entirety of current and historical U.S. law accessible on the Internet."  Br. 43, 44.  But creating a mere compilation, without more, is not transformative—just as collecting all Beatles hits in one place

would not allow their distribution to the public for free.  PRO's reliance on *Warren Publishing Co. v. Spurlock*, 645 F. Supp. 2d 403 (E.D. Pa. 2009), is misplaced because the defendant there not only compiled pre-existing works but also provided its own original expressive content—which PRO does not.

Third, PRO argues that its use is transformative because PRO is indifferent to any of the Works' creativity or technical merit.  Br. 45. PRO's interest (or lack thereof) in what the Works say is beside the point; PRO makes complete copies of the Works available to the public in a substitutional form.[7]

---

[7] None of the cases PRO cites involved wholesale substitution.  *See Am. Inst. of Physics v. Winstead PC*, No. 3:12-CV-1230, 2013 WL 6242843, at *5 (N.D. Tex. Dec. 3, 2013) (defendant made copies to analyze material for submission of prior art to the USPTO); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 545 (6th Cir. 2004) (no "independent market" for the pre-existing work (a computer program for printer functionality)); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 611 (2d Cir. 2006) (biographer reproduced concert posters in "significantly reduced" size "inadequate to offer more than a glimpse of their expressive value"); *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003) ("defendants made copies of the manuscript to use its content as evidence in the child-custody litigation").

Fourth, PRO argues that converting the Works to HTML format transforms them.  The district court soundly rejected this argument.[8] Dkt-175 at 35 (JA2093).  As another court put it, "[a] simple repackaging of a work in a new format, whether on the Internet or on a CD-ROM or on a flash drive, is not transformative when the result is simply a mirror image reflected on a new mirror."  *Soc'y of the Transfiguration Monastery, Inc. v. Archbishop Gregory*, 685 F. Supp. 2d 217, 227 (D. Mass. 2010), *aff'd*, 689 F.3d 29 (1st Cir. 2012)*; see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 72 (2d Cir. 1999) (holding that a translation is not a transformative, expressive work); 4 *Nimmer on Copyright* § 13.05(1)(b) (2017).

Fifth, PRO and *amicus* Sina Bahram assert that PRO's website is transformative because it makes Plaintiffs' standards accessible to visually disabled persons.  Setting aside that not all of PRO's own posted versions of Plaintiffs' standards are accessible to the visually-disabled, *see* Dkt-175 at 36 (JA2094), PRO's post-hoc justification must be rejected.  To be sure, the Chafee Amendment, 17 U.S.C. § 121, allows

---

[8] Indeed, as the district court noted, the assertion underlying PRO's argument is factually untrue for AERA's Standards for Educational and Psychological Testing, which PRO simply posted in PDF format.  Dkt-175 at 8-9 (JA2066-JA2067).

organizations serving the visually impaired to copy works without permission from the copyright owner, as long as those copies are available *exclusively* for the use of the visually impaired.  But that is not what PRO did here.

In fact, PRO's expert, James Fruchterman, explained that he runs an online library for the visually impaired that already contains the 2014 edition of the NEC, and that nothing would prevent PRO from uploading Plaintiffs' other standards to that library.  Dkt-155-8, Ex. 1 (209:18-213:23) (JA1971-JA1975).  If PRO's true purpose was concern for the visually impaired, it has an easy and lawful way of promoting access to Plaintiffs' Works that would not involve posting the standards on the internet for free, unauthorized distribution to anyone.  *See, e.g.*, *HathiTrust*, 755 F.3d at 101 (fair use proven where, unlike here, a digital library provided full-text copies only to users who could document their print disabilities).

Plaintiffs already make their Works available to the visually impaired—and there is no evidence that any disabled person (or anyone else, for that matter) has ever been unable to access Plaintiffs' standards.  Plaintiffs either have or indisputably would honor any

request from print-disabled persons to access their standards in a useable format. *See* Dkt-155-7 ¶17; Dkt-155-6 ¶¶4-5; Dkt-155-5 ¶¶5-6 (JA1947; JA1941; JA1937). The district court's conclusion that PRO had "not offered a sufficiently new purpose to render the use transformative" is correct. Dkt-175 at 37 (JA2095).

Finally, PRO is wrong that its use is non-commercial. Under the Supreme Court's test, PRO "st[ood] to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). By its own admission, PRO exploited Plaintiffs' standards to boost its fundraising. Dkt-118-12, Ex. 3 (243:21-244:4, 245:15-246:13); Ex. 4 (126:4-16); Ex. 19 (JA686-JA687, JA688-JA689; JA712; JA801-JA804).[9]

---

[9] The district court correctly held that PRO's use "bears 'commercial' elements given that it actively engaged in distributing identical standards online in the same consumer market." Dkt-175 at 34 (JA2092). PRO's distributed copies operate as "substantial substitute[s]" for the sale of Plaintiffs' Works in the same market. *Authors Guild*, 804 F.3d at 207. In *Authors Guild*, the Second Circuit ultimately found fair use, but explained that "[i]f Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public, their claim would be strong." *Id.* at 225-26; *accord HathiTrust*, 755 F.3d at 97. PRO did exactly what the Second Circuit said would make a plaintiff's claim "strong"—it created digitized copies of Plaintiffs' Works and provided its copies to the public without limitations. None of PRO's cited cases (Br.

- 39 -

### 2.    Plaintiffs' Works Are Expressive And Merit Full Copyright Protection

The second § 107 factor ("the nature of the copyrighted work") asks whether the work is "close[] to the core of intended copyright protection." *Campbell*, 510 U.S. at 586.  PRO argues that Plaintiffs' Works are "facts" because they are given legal effect.  Br. 46.  The district court correctly held that because the Works "are vital to the advancement of scientific progress in the U.S.," they are "exactly the type of expressive work that warrants full protection under the Constitution and the Copyright Act."  Dkt-175 at 38 (JA2096); *see also Campbell*, 510 U.S. at 586; *Authors Guild*, 804 F.3d at 220 (reaffirming importance of protecting "authors of factual works" from unrestricted copying of their works).

### 3.    PRO Engaged In Wholesale Copying And Distribution Of Plaintiffs' Works

The third § 107 factor ("the amount and substantiality of the" work taken) plainly favors Plaintiffs because PRO copied and distributed Plaintiffs' entire Works.  "While wholesale copying does not preclude fair use *per se*, copying an entire work militates against a

---

42) involved the mass creation and distribution of substitutional copies into plaintiff's market.

finding of fair use." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (internal quotation marks and citation omitted).

PRO argues that wholesale copying is still fair use "when it reasonably fulfills the user's purpose."[10] Br. 46. This presumes a transformative purpose; PRO has none. Again, none of PRO's cases involved wholesale copying and distribution that provided a market substitute for the plaintiff's work. Indeed, in *Authors Guild*, the Second Circuit concluded that the third factor would have weighed *against* Google if the snippet view feature enabled users to view substantially more of the book. 804 F.3d at 223.

### 4. PRO's Use Undermines The Market For Plaintiffs' Works

The fourth § 107 factor ("the effect of the use upon the potential market for or value of the copyrighted work") "is of great importance in making a fair use assessment." 804 F.3d at 223. "Even if the *purpose* of

---

[10] PRO's copying and dissemination of AERA's Standards for Educational and Psychological Testing in its entirety could not possibly be so justified because the DOE regulatory requirements that refer to the Standards designate only a few portions of them, *see* AERA Br. 6-7, 10, and disseminating the remainder of the Standards document could not properly be considered as necessary to fulfill even PRO's non-transformative purpose.

the copying is for a valuably transformative purpose, such copying

might nonetheless harm the value of the copyrighted original if done in

a manner that results in widespread revelation of sufficiently

significant portions of the original as to make available a significantly

competing substitute." *Id.* (emphasis in original).

The district court correctly held that PRO's use negatively impacts

the market for Plaintiffs' Works because "consumers in the online

marketplace are currently presented with the option to purchase a PDF

or hard copy version of Plaintiffs' standards directly from them, or may

download a PDF of an identical standard for no cost." Dkt-175 at 39

(JA2097).

PRO's assertion that "the record in this case reveals *no* harm to

the SDOs' revenues" is simply wrong. Br. 48. NFPA's sales of the

National Electrical Code declined by over 30% from the publication

cycle before PRO posted the full (and not state-specific) version to the

cycle afterward. *See* Dkt-118-12, Ex. 1 ¶133 (JA469-JA471). The

unrebutted expert economic testimony indicates that "Plaintiffs are

likely to stand to lose a majority of their revenue and gross profits from the loss of copyright protection here." [11]  Dkt-118-12, Ex. 1 ¶138 (JA472).

PRO erroneously argues that the district court treated the commercial reality of PRO's use as a "conclusive presumption" against fair use.  Br. 49.  The district court did nothing of the kind—it simply held PRO to its burden of showing that its use threatened no substitutional harm.  Dkt-175 at 39 (JA2097).  Even on appeal, PRO cites no evidence to meet its burden on this point. [12]

---

[11] PRO argues that Plaintiffs' economic expert, John Jarosz, was not qualified because he lacked experience with standards development and his opinions relied on facts provided by Plaintiffs' executives about the market for their Works.  Br. 40 n.10.  The district court was well within its sound discretion, *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010), in concluding that: (1) Jarosz had the requisite expertise "[b]ased on Jarosz's education, publications, and participation as an expert in intellectual property infringement in hundreds of other cases," and (2) his opinions were "sufficiently supported" by his review of "extensive number of deposition transcripts, documents, websites, publications, and data reviewed by Jarosz."  Dkt-172 at 2 (JA2052); *see Coleman v. Parkline Corp.*, 844 F.2d 863, 866 (D.C. Cir. 1988) (Rule 702 "does not require the expert to have personal familiarity with the subject of his testimony").

[12] A copyright owner has no obligation to show any actual revenue loss; rather, "the court's role with respect to the fourth factor is to 'look at the impact on *potential* licensing revenues for traditional, reasonable, or likely to be developed markets.'"  *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 623 n.20 (S.D.N.Y. 2015) (quoting *Bill Graham Archives*, 448 F.3d at 614) (emphasis in original).

PRO also claims that the standards are out-of-date and some are not currently sold in print, Br. 48, but the market, even for older standards, is still Plaintiffs' to exploit. *See Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145-46 (2d Cir. 1998) (even where copyright holder "has evidenced little if any interest in exploiting this market ... copyright law must respect that creative and economic choice"); *Worldwide Church of God*, 227 F.3d at 1119 (same); *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) (copyright holder need not have entered the market because it has the right "to curb the development of such a derivative market by refusing to license a copyrighted work or by doing so only on terms the copyright owner finds acceptable").

If PRO's wholesale copying of the Works is fair use, then nothing stops *other* would-be-infringers from copying the Works and posting them on the internet, or even publishing them in print, and then distributing free or lower-cost copies of the standards than those Plaintiffs sell. This would destroy the potential market for Plaintiffs' standards. As the First Circuit put it: "If anyone could freely access the Works, electronically or otherwise, .... the Monastery's translations of

ancient texts (which the Archbishop does not contest were expensive to create) would have been toiled over, with no possible market in which to reap the fruits of its labor." *Soc'y of Holy Transfiguration Monastery*, 689 F.3d at 65.

## D.    The Constitution Protects Plaintiffs' Copyrights

PRO invokes the Constitution to defend its massive copyright infringement, but neither the Due Process Clause nor the First Amendment protects PRO's conduct or justifies interpreting the Copyright Act as PRO urges.[13]

PRO's due process arguments are specious.  To the extent PRO contends that legal enforcement of the standards set forth in Plaintiffs' Works actually violates due process, PRO obviously lacks standing to bring such a claim.  PRO has not been deprived of due process in any

---

[13] Indeed, the Second and Ninth Circuits have expressed concern that any holding that incorporation by reference in a statute or regulation strips preexisting standards of copyright protection would raise constitutional concerns.  *CCC*, 44 F.3d at 74 ("[A] rule that the adoption of such a reference by a state legislature or administrative body deprived the copyright owner of its property would raise very substantial problems under the Takings Clause of the Constitution."); *Practice Mgmt.*, 121 F.3d at 520 (noting same concern).  This Court should not create a constitutional problem where none exists.  *See, e.g.*, *Miller v. French*, 530 U.S. 327, 336 (2000) ("constitutionally doubtful constructions should be avoided where 'fairly possible'").

sense.  It does not (and cannot plausibly) contend that it will be subject to enforcement of any law incorporating Plaintiffs' Works, let alone subject to such enforcement without fair notice.  Nor does it come close to satisfying the demanding criteria for establishing third-party standing.  *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) ("Ordinarily, a party 'must assert his own legal rights' and 'cannot rest his claim to relief on the legal rights ... of third parties.'"). (citations omitted); *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (exception for third-party standing requires that the plaintiff has "a close relation to the third party" *and* that there is "some hindrance to the third party's ability to protect his or her own interests").

Nor is it plausible to contend that Congress's continued recognition of copyright protection for standards incorporated by reference violates due process in and of itself.  The undisputed record refutes PRO's claim that recognizing copyright in standards incorporated by reference denies the public "the 'fair warning' required under the Due Process Clause." *Cty. of Suffolk, N.Y. v. First Am. Real Estate Solutions*, 261 F.3d 179, 195 (2d Cir. 2001) (no due process violation resulting from copyright of tax maps).  Moreover, despite

litigating these cases in the district court for years, PRO never identified a single individual unable to access the Works in question. *See Practice Mgmt.*, 121 F.3d at 519 (rejecting due process argument because "[t]here [was] no evidence that anyone wishing to use" codes incorporated by reference into federal regulation "ha[d] any difficulty obtaining access"). As the district court observed, PRO "simply" wants "more expansive access," including the ability to make derivative works. Dkt-175 at 28-29 (JA2086-JA2087). Its inability to do so without authorization does not violate due process.

PRO's First Amendment argument is equally meritless. Copyright is not extinguished merely because the copyrighted work contains "matters of public interest." Br. 20. To the contrary, the Supreme Court has consistently rejected "heightened judicial review" of copyright law under the First Amendment because the Copyright Act "contains built-in First Amendment accommodations." *Eldred v. Ashcroft*, 537 U.S. 186, 218-19 (2003); *Golan v. Holder*, 565 U.S. 302, 327-28 (2012); *Harper & Row*, 471 U.S. at 559 ("It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public.").

- 47 -

Copyright law accommodates First Amendment interests in two ways: the "distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use." *Harper & Row*, 471 U.S. at 560; 5 *Nimmer on Copyright* § 19E.06 (2017). If copyright protection is consistent with "those two doctrines," it is "immune from First Amendment scrutiny." 5 *Nimmer on Copyright* § 19E.06; *see Kahle v. Gonzales*, 487 F.3d 697, 699 (9th Cir. 2007) (rejecting argument that change from an "opt-in" to an "opt-out" copyright system required First Amendment review); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (First Amendment right to anonymity "does not ... provide a license for copyright infringement").

PRO ignores this authority, instead relying on cases invalidating statutes that had nothing whatsoever to do with copyright. *See* Br. 20 (citing *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 604 (1982) (closing criminal trials); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 781-83 (1978) (limiting corporations' ability to make contributions or expenditures on elections); *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965) (forbidding use of

contraceptives); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (punishing possession of obscene materials)).  To be sure, the First Amendment protects the rights to speak and protest, to disseminate and receive information and ideas, and to petition the government.  But those values are already accounted for by fair use and the idea/expression dichotomy, as *Eldred*, *Golan*, and *Harper & Row* make clear.  Where, as here, the work is validly copyrightable expression, and the infringement not a fair use, the First Amendment imposes no additional constraints on the scope of copyright.

## II.    The District Court Correctly Held That PRO Infringed Plaintiffs' Trademarks

PRO does not dispute that Plaintiffs own valid, registered trademarks or that PRO used those trademarks in disseminating electronic copies of the Works without consent.  Nor does PRO dispute that when it manually scanned paper versions of the Works, it altered them by adding material and changing text, drawings, and formulas— introducing errors in the process—and yet advertised those files using Plaintiffs' trademarks.  Dkt-118-12, Ex. 2 (156:15-157:5, 194:14-20); Ex. 3 (127:4-139:8); Ex. 16; Dkt-118-13, Exs. 25-29 (JA549-JA550; JA571; JA651-JA663; JA771-JA800; JA810-JA929).  PRO attempts to argue

that its actions are permitted (i) under the Supreme Court's decision in *Dastar*, and (ii) as nominative fair use. Neither argument supports reversal.

### A. *Dastar* Does Not Preempt Plaintiffs' Trademark Claims

*Dastar* involved a different kind of trademark claim and different statutory language. The defendant there produced videos incorporating material from a television series whose copyright had expired; the plaintiffs alleged the defendant did not give them "proper credit" for owning the original series. 539 U.S. at 27. This type of claim—not the same as Plaintiffs' here—is called "reverse passing off," *i.e.*, the defendant "misrepresents someone else's goods ... as his own." *Id.* at 27 n.1.

*Dastar*'s plaintiffs based their claim on § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which the Court emphasized "appl[ied] only to certain unfair trade practices prohibited by its text." 539 U.S. at 29. Specifically, they had to prove the defendant was responsible for a falsehood likely to cause confusion "as to the origin" of the defendant's goods. *Id.* at 31 (quoting § 43(a)). The Supreme Court refused to read this language "as creating a cause of action for, in effect, plagiarism—

the use of otherwise unprotected works and inventions without attribution." *Id.* at 36.  That conclusion bears no relevance to this case.

First, Plaintiffs' claims do not turn on the "inherently limited wording" of § 43(a) that *Dastar* interpreted.  *Id.* at 29 (citation omitted). They arise under § 32, 15 U.S.C. § 1114, the cause of action for infringement of *registered* trademarks, *see B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1301 (2015), because Plaintiffs undisputedly "have federal trademark registrations for each of the asserted marks."  Dkt-175 at 45 (JA2103).  Unlike § 43(a)'s treatment of unregistered marks, § 32's prohibition is not restricted to confusion about the "origin of goods"—the issue in *Dastar*—and in fact does not even include that phrase.[14]

Second, Plaintiffs do not complain about a *lack* of attribution, but improper attribution based on PRO using their trademarks on PRO's files.  This "is the opposite" of the "reverse passing off" claim asserted in *Dastar*.  *Id.* at 27 n.1.  As *Dastar* itself recognized, trademark law has long prohibited passing off that "deceive[s] consumers and impair[s] a

---

[14] *Amici* Intellectual Property Professors ("IP Professors") correctly note (IP Professors Br. 6 n.2) that "the *Dastar* rule derives from a construction of the text of the Lanham Act," but like PRO completely ignore this textual difference in the two provisions.

producer's goodwill," as might happen with "the Coca-Cola Company's passing off its product as Pepsi-Cola." *Id.* at 32. This is so because the trademark holder has the "right to control the quality of the goods manufactured and sold under its trademark." *Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006).

That is precisely the right Plaintiffs seek to enforce. As PRO concedes (Br. 52), PRO—not Plaintiffs—is the source of the electronic files. And contrary to *amici* IP Professors' suggestion (Br. 7), PRO did not simply copy the Works without change; it altered them and introduced errors. *See, e.g.*, Dkt-118-12, Ex. 3 (127:4-139:8); Ex. 16 (JA651-JA663; JA771-JA800) (PDF version of ASTM D86-07 with errors); Dkt-118-13, Ex. 29 (JA906-JA929) (HTML version of ASTM D86-07 with errors). PRO's use of Plaintiffs' exact trademarks inevitably leads to confusion, as consumers are misled into thinking the defective PRO files are associated with or produced by Plaintiffs. *See, e.g.*, *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1248-49 (11th Cir. 2002) (use of identical mark on similar product demonstrates a likelihood of confusion); *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190-91 (6th Cir. 1988) (same). *Cf. Foxtrap,*

*Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 639 (D.C. Cir. 1982) (crux of

trademark infringement claim is that consumers will likely believe

defendant's products come from same source or are affiliated with

plaintiff).

Given the nature of Plaintiffs' complaints, PRO finds no support in

two recent cases involving karaoke tracks.  *See Slep-Tone Entm't Corp.*

*v. Wired for Sound Karaoke & DJ Servs., LLC*, 845 F.3d 1246, 1250 (9th

Cir. 2017) (defendants never disseminated the unauthorized track

copies and so did not use the plaintiffs' "marks 'in connection with the

sale, offering for sale, distribution, or advertising' of the files under 15

U.S.C. § 1114(1)(a)"); *Phoenix Entm't Partners v. Rumsey*, 829 F.3d 817,

828, 831 (7th Cir. 2016) (defendants were "not selling compact discs

with karaoke tracks and billing them as genuine Slep-Tone tracks, in

the way that a street vendor might hawk knock-off Yves Saint Laurent

bags or Rolex watches to passers-by").  Here, by contrast, PRO's whole

aim (and actual practice) is to disseminate its electronic files containing

Plaintiffs' standards over the Internet, and it prominently used

Plaintiffs' trademarks in promoting those files.  Dkt-118-12, Ex. 23;

Dkt-118-13, Exs. 27-28 (JA805-JA809; JA818-JA905).  And unlike in

the karaoke cases, where there were no allegations "that the defendants' copies [were] noticeably inferior," *Rumsey*, 829 F.3d at 831, PRO made errors in scanning and retyping the Works. Because the Works relate to health and safety concerns, PRO's errors could pose serious threats to the health and safety of the public, giving Plaintiffs ample cause for concern about the potential harm to the goodwill associated with their marks. *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246 (2d Cir. 2009) ("The mark holder is entitled to protection against acts that subvert its ability to protect the reputation of its marks by exercising quality controls.").

Third, Plaintiffs are not attempting to make an end-run around copyright law by asserting a trademark infringement claim; they have valid, unexpired copyrights in the Works. There is thus no tension at all here between the asserted trademark claim and copyright law's limits because PRO has separately violated both species of Plaintiffs' intellectual property rights. *See Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007 (9th Cir. 1994) (affirming finding of liability under both copyright and trademark law where defendant copied Nintendo

games (copyright infringement) and sold the games by advertising that they were Nintendo products (trademark infringement)).

### B.    PRO's Use Of Plaintiffs' Trademarks Was Not Nominative Fair Use

PRO's second argument fares no better.[15]  As the district court correctly held, PRO's use of Plaintiffs' trademarks was not nominative fair use.  In several circuits that have recognized that concept—and this Court has not yet weighed in—"a nominative use is one in which the defendant uses the plaintiff's trademark to identify the plaintiff's own goods, and makes it clear to consumers that the plaintiff, not the defendant, is the source of the trademarked product or service." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 154 (4th Cir. 2012) (internal citations and quotation marks omitted).

---

[15] PRO separately faults the district court for construing PRO's use of the Plaintiffs' trademarks as a "trademark use[]." Br. 54.  Because PRO cites no legal authority supporting this argument, and fails to develop any basis for treating this issue separately, this brief focuses on the nominative fair use doctrine.  *See, e.g.*, *Rollins Envtl. Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991).  Similarly, *amici* IP Professors' inapposite argument rooted in artists' First Amendment interests (IP Professors Br. 11-15) is not properly at issue because it has not been advanced and preserved by any non-*amicus* party.  *See, e.g.*, *Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1338 (D.C. Cir. 1998).

PRO's use of Plaintiffs' trademarks was not a nominative fair use under any circuit's standard, including those PRO favors (Br. 55). Under the Ninth Circuit's seminal formulation, nominative fair use has three requirements:

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992) (footnote omitted).  Other circuits have endorsed the same or substantively similar factors.  *Int'l Info. Sys. Sec. Certification Consortium v. Sec. Univ., LLC*, 823 F.3d 153, 166, 168 (2d Cir. 2016) (collecting cases).  PRO cannot satisfy any, much less all, of the three *New Kids* factors.

First, it was not necessary for PRO to refer to Plaintiffs or their trademarks to describe Plaintiffs' Works.  Although PRO now argues that it included the trademarks in its electronic files "to avoid making intentional changes from the content of the law," Br. 53, nothing stopped PRO from omitting Plaintiffs' trademarks, or posting only the

specific materials referenced in the relevant government regulation, without identifying Plaintiffs.  In *Veeck*, by contrast, the website operator simply posted the text of the codes and identified them as the building codes of the relevant jurisdictions; the "website did not specify that the codes were written by" the code-writing organization.  293 F.3d at 793.

Second, PRO effectively conceded that it used more of Plaintiffs' trademarks than necessary to identify Plaintiffs' Works.  *See, e.g.*, Motions Hr'g Tr. 116:22-23 (JA2056) ("Public.Resource would take direction from this Court.  Logos: yes or no?  It doesn't care."); *id.* at 117:6-7 (JA2057) ("if they want the logos off, we will get the logos off, Your Honor"); *id.* at 118:13-16 (JA2058) ("we would drop the logo in a second if that's the Court's direction").  Use of a logo is the paradigmatic use of more than what is necessary to identify a product.  *See, e.g.*, *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1181 (9th Cir. 2010) (use of a stylized mark and logo was more use of the mark than was necessary).  *Cf. New Kids*, 971 F.2d at 308 (stressing that defendants did "not use the New Kids' distinctive logo").

Third, PRO's electronic files inaccurately suggest that Plaintiffs endorse the files and that they are genuine versions of Plaintiffs' Works. PRO admitted that it intends just that.  Dkt-118-12, Ex. 3 (46:14-47:9) (JA611-JA612).  The "disclaimers" placed on PRO's website cannot mitigate the likelihood of confusion and, as the district court observed, "can hardly be called disclaimers at all."  Dkt-175 at 50 (JA2108).  They do not reveal that the files are PRO's own attempts at reproducing Plaintiffs' Works or that the files are unauthorized and unassociated with Plaintiffs.[16]  The district court correctly concluded that PRO's use of Plaintiffs' trademarks was not nominative fair use.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

---

[16] In full, the purported disclaimer states: "In order to promote public education and public safety, equal justice for all, a better informed citizenry, the rule of law, world trade and world peace", this legal document is hereby made "available on a noncommercial basis, as it is the right of all humans to know and speak the laws that govern them." Dkt-118-13, Ex. 32 (JA953); *see also* Dkt-118-13, Ex. 26 (JA815) (showing cover page containing no disclaimer).

Dated:  February 14, 2018     Respectfully submitted,

/s/ Allyson N. Ho
ALLYSON N. HO
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
Tel: 214.466.4180
Email: allyson.ho@morganlewis.com

J. KEVIN FEE
JORDANA S. RUBEL
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: 202.739. 5353
Email: kevin.fee@morganlewis.com
          jordana.rubel@morganlewis.com

*Counsel for American Society for Testing
and Materials d/b/a/ ASTM International*

/s/ Donald B. Verrilli, Jr.
DONALD B. VERRILLI, JR.
MUNGER, TOLLES & OLSON LLP
1155 F Street, N.W., 7th Floor
Washington, D.C.  20004
Tel: 202.220.1100
Email:  donald.verrilli@mto.com

KELLY M. KLAUS
ROSE L. EHLER
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel:  415.512.4000

Email: kelly.klaus@mto.com
     rose.ehler@mto.com

*Counsel for National Fire Protection
Association, Inc.*


/s/ *Joseph R. Wetzel*
ANNE VOIGTS
JOSEPH R. WETZEL
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, CA 94105
Tel: 415.318.1211
Email:  avoigts@kslaw.com
     jwetzel@kslaw.com

J. BLAKE CUNNINGHAM
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, TX 78701
Tel: 512.457.2000
Email:  bcunningham@kslaw.com

*Counsel for American Society of Heating,
Refrigerating, and Air Conditioning
Engineers, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in this Court's Order of August 16, 2017, because it contains 11,206 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), according to the count of Microsoft Word.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

February 14, 2018

*/s/ Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr.

# ADDENDUM OF STATUTES AND REGULATIONS

# ADDENDUM TABLE OF CONTENTS

Page

STATUTES

15 U.S.C. § 1114(1) ...................................................................... 3a

15 U.S.C. § 1125(a) ..................................................................... 4a

17 U.S.C. § 102(a) ........................................................................ 5a

17 U.S.C. § 106(1) ........................................................................ 6a

17 U.S.C. § 106(3) ........................................................................ 6a

17 U.S.C. § 121 ............................................................................. 6a

17 U.S.C. § 410 ............................................................................. 8a

National Technology Transfer and Advancement Act of 1995,
    Pub. L. No. 104-113, § 12(d), 110 Stat. 775 ......................... 1a

REGULATIONS

40 C.F.R. § 75, Appendix D (2012) ............................................ 9a

39 Fed. Reg. 23,502, 23,538 (June 27, 1974) ......................... 10a

63 Fed. Reg. 8546, 8554 (Feb. 19, 1998) ............................... 11a

79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014) .......................... 12a

OTHER AUTHORITIES

H.R. REP. NO. 94-1476 (1976) ................................................ 13a

H.R. REP. NO. 104-390 (1995) ................................................ 14a

U.S. Copyright Office, Compendium of Copyright Office
    Practices § 313.6(C)(1) (3d ed. 2014) ................................. 17a

## ADDENDUM OF STATUTES AND REGULATIONS[17]

**PUBLIC LAW 104–113—MAR. 7, 1996**
**NATIONAL TECHNOLOGY TRANSFER AND ADVANCEMENT**
**ACT OF 1995**
PL 104–113, March 7, 1996, 110 Stat 775

Public Law 104-113
104th Congress

An Act

To amend the Stevenson-Wydler Technology Innovation Act of 1980
with respect to inventions made under cooperative research and
development agreements, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United
States of America in Congress assembled,*

## SECTION 1. SHORT TITLE.

This Act may be cited as the "National Technology Transfer and
Advancement Act of 1995".

* * *

## SEC. 12. STANDARDS CONFORMITY.

* * *

(d) UTILIZATION OF CONSENSUS TECHNICAL STANDARDS BY
FEDERAL AGENCIES; REPORTS.—

(1) IN GENERAL.—Except as provided in paragraph (3) of this
subsection, all Federal agencies and departments shall use
technical standards that are developed or adopted by voluntary
consensus standards bodies, using such technical standards as a
means to carry out policy objectives or activities determined by the
agencies and departments.

---

[17] Except for the following, all applicable statutes and regulations are
contained in the Brief for appellant PRO.

(2) CONSULTATION; PARTICIPATION.—In carrying out paragraph (1) of this subsection, Federal agencies and departments shall consult with voluntary, private sector, consensus standards bodies and shall, when such participation is in the public interest and is compatible with agency and departmental missions, authorities, priorities, and budget resources, participate with such bodies in the development of technical standards.

(3) EXCEPTION.—If compliance with paragraph (1) of this subsection is inconsistent with applicable law or otherwise impractical, a Federal agency or department may elect to use technical standards that are not developed or adopted by voluntary consensus standards bodies if the head of each such agency or department transmits to the Office of Management and Budget an explanation of the reasons for using such standards. Each year, beginning with fiscal year 1997, the Office of Management and Budget shall transmit to Congress and its committees a report summarizing all explanations received in the preceding year under this paragraph.

(4) DEFINITION OF TECHNICAL STANDARDS.—As used in this subsection, the term "technical standards" means performance-based or design-specific technical specifications and related management systems practices.

* * *

**15 U.S.C. § 1114**
§ 1114. Remedies; infringement; innocent infringement by printers and publishers

\* \* \*

**(1)** Any person who shall, without the consent of the registrant--

    **(a)** use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

    **(b)** reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

As used in this paragraph, the term "any person" includes the United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, or other persons acting for the United States and with the authorization and consent of the United States, and any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. The United States, all agencies and instrumentalities thereof, and all individuals, firms, corporations, other persons acting for the United States and with the authorization and consent of the United States, and

- 3a -

any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

\* \* \*

**15 U.S.C. § 1125**
§ 1125. False designations of origin, false descriptions, and dilution forbidden

## (a) Civil action

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> **(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

**(2)** As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

**(3)** In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

\* \* \*

**17 U.S.C. § 102**
§ 102. Subject matter of copyright: In general

**(a)** Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

   **(1)** literary works;

   **(2)** musical works, including any accompanying words;

   **(3)** dramatic works, including any accompanying music;

   **(4)** pantomimes and choreographic works;

   **(5)** pictorial, graphic, and sculptural works;

   **(6)** motion pictures and other audiovisual works;

   **(7)** sound recordings; and

   **(8)** architectural works.                    \* \* \*

- 5a -

**17 U.S.C. § 106**

§ 106. Exclusive rights in copyrighted works

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

**(1)** to reproduce the copyrighted work in copies or phonorecords;

\* \* \*

**(3)** to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

\* \* \*

**17 U.S.C. § 121**

§ 121. Limitations on exclusive rights: Reproduction for blind or other people with disabilities

**(a)** Notwithstanding the provisions of section 106, it is not an infringement of copyright for an authorized entity to reproduce or to distribute copies or phonorecords of a previously published, nondramatic literary work if such copies or phonorecords are reproduced or distributed in specialized formats exclusively for use by blind or other persons with disabilities.

**(b)(1)** Copies or phonorecords to which this section applies shall--

**(A)** not be reproduced or distributed in a format other than a specialized format exclusively for use by blind or other persons with disabilities;

**(B)** bear a notice that any further reproduction or distribution in a format other than a specialized format is an infringement; and

**(C)** include a copyright notice identifying the copyright owner and the date of the original publication.

**(2)** The provisions of this subsection shall not apply to standardized, secure, or norm-referenced tests and related testing material, or to computer programs, except the portions thereof that are in conventional human language (including descriptions of pictorial works) and displayed to users in the ordinary course of using the computer programs.

**(c)** Notwithstanding the provisions of section 106, it is not an infringement of copyright for a publisher of print instructional materials for use in elementary or secondary schools to create and distribute to the National Instructional Materials Access Center copies of the electronic files described in sections 612(a)(23)(C), 613(a)(6), and section 674(e) of the Individuals with Disabilities Education Act that contain the contents of print instructional materials using the National Instructional Material Accessibility Standard (as defined in section 674(e)(3) of that Act), if--

> **(1)** the inclusion of the contents of such print instructional materials is required by any State educational agency or local educational agency;
>
> **(2)** the publisher had the right to publish such print instructional materials in print formats; and
>
> **(3)** such copies are used solely for reproduction or distribution of the contents of such print instructional materials in specialized formats.

**(d)** For purposes of this section, the term--

> **(1)** "authorized entity" means a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities;
>
> **(2)** "blind or other persons with disabilities" means individuals who are eligible or who may qualify in accordance with the Act entitled "An Act to provide books for the adult blind", approved

March 3, 1931 (2 U.S.C. 135a; 46 Stat. 1487) to receive books and other publications produced in specialized formats;

**(3)** "print instructional materials" has the meaning given under section 674(e)(3)(C) of the Individuals with Disabilities Education Act; and

**(4)** "specialized formats" means--

> **(A)** braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities; and

> **(B)** with respect to print instructional materials, includes large print formats when such materials are distributed exclusively for use by blind or other persons with disabilities.

* * *

## 17 U.S.C. § 410

§ 410. Registration of claim and issuance of certificate

**(a)** When, after examination, the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of this title have been met, the Register shall register the claim and issue to the applicant a certificate of registration under the seal of the Copyright Office. The certificate shall contain the information given in the application, together with the number and effective date of the registration.

**(b)** In any case in which the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant in writing of the reasons for such refusal.

**(c)** In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded

the certificate of a registration made thereafter shall be within the discretion of the court.

**(d)** The effective date of a copyright registration is the day on which an application, deposit, and fee, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, have all been received in the Copyright Office.

\* \* \*

**40 C.F.R. § 75, Appendix D (2012)**
**APPENDIX D TO PART 75—OPTIONAL SO₂ EMISSIONS DATA PROTOCOL FOR GAS–FIRED AND OIL–FIRED UNITS**

1. Applicability

1.1  This protocol may be used in lieu of continuous $SO_2$ pollutant concentration and flow monitors for the purpose of determining hourly $SO_2$ mass emissions and heat input from: gas-fired units, as defined in § 72.2 of this chapter, or oil-fired units, as defined in § 72.2 of this chapter. Section 2.1 of this appendix provides procedures for measuring oil or gaseous fuel flow using a fuel flowmeter, section 2.2 of this appendix provides procedures for conducting oil sampling and analysis to determine sulfur content and gross calorific value (GCV) of fuel oil, and section 2.3 of this appendix provides procedures for determining the sulfur content and GCV of gaseous fuels.

\* \* \*

2. Procedure

\* \* \*

2.2.6  Where the flowmeter records volumetric flow rate rather than mass flow rate, analyze oil samples to determine the density or specific gravity of the oil. Determine the density or specific gravity of the oil sample in accordance with ASTM D287–92 (Reapproved 2000), Standard Test Method for API Gravity of Crude Petroleum and Petroleum Products (Hydrometer Method), ASTM D1217–93 (Reapproved 1998), Standard Test Method for Density and Relative

- 9a -

Density (Specific Gravity) of Liquids by Bingham Pycnometer, ASTM D1481–93 (Reapproved 1997), Standard Test Method for Density and Relative Density (Specific Gravity) of Viscous Materials by Lipkin Bicapillary Pycnometer, ASTM D1480–93 (Reapproved 1997), Standard Test Method for Density and Relative Density (Specific Gravity) of Viscous Materials by Bingham Pycnometer, ASTM D1298–99, Standard Test Method for Density, Relative Density (Specific Gravity), or API Gravity of Crude Petroleum and Liquid Petroleum Products by Hydrometer Method, or ASTM D4052–96 (Reapproved 2002), Standard Test Method for Density and Relative Density of Liquids by Digital Density Meter (all incorporated by reference under § 75.6 of this part). Alternatively, the oil samples may be analyzed for density or specific gravity by any consensus standard method prescribed for the affected unit under part 60 of this chapter.

\* \* \*

**39 Fed. Reg. 23,502, 23,538 (June 27, 1974)**

\* \* \*

§ 1910.68 Manlifts.

\* \* \*

(b) *General requirements-*
 (1) A*pplication.*  This section applies to the construction, maintenance, inspection, and operation of manlifts in relation to accident hazards. Manlifts covered by this section consist of platforms or brackets and accompanying handholds mounted on, or attached to an endless belt, operating vertically in one direction only and being supported by, and driven through pulleys, at the top and bottom. These manlifts are intended for conveyance of persons only. It is not intended that this section cover moving stairways, elevators with enclosed platforms ("Paternoster" elevators), gravity lifts, nor conveyors used only for conveying material. This section applies to manlifts used to carry only personnel trained and authorized by the employer in their use.
 (2) *Purpose.* The purpose of this section is to provide reasonable safety for life and limb.

(3) *Design requirements*. All new manlift installations and equipment installed after the effective date of these regulations shall meet the design requirements of the "American National Safety Standard for Manlifts ANSI A90.1-1969", and the requirements of this section.

(4) Reference to other codes and subparts. The following codes, and subparts of this part, are applicable to this section. Safety Code for Mechanical Power Transmission Apparatus ANSI B15.1-1953 (R 1958) and Subpart O; National Electrical Code, NFPA 70-1971; ANSI C1-1971 (Rev. of C1-1968) and Subpart S; Safety Code for Fixed Ladders, ANSI A14.3-1956 and Safety Requirements for Floor and Wall Openings, Railings and Toeboards, ANSI A12.1-1967 and Subpart D.

\* \* \*

**63 Fed. Reg. 8546, 8554 (Feb. 19, 1998)**
**Office of Management and Budget**
**OMB Circular A-119; Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities**
\* \* \*

2. What Are The Goals Of The Government In Using Voluntary Consensus Standards?

Many voluntary consensus standards are appropriate or adaptable for the Government's purposes. The use of such standards, whenever practicable and appropriate, is intended to achieve the following goals:

a. Eliminate the cost to the Government of developing its own standards and decrease the cost of goods procured and the burden of complying with agency regulation.

b. Provide incentives and opportunities to establish standards that serve national needs.

c. Encourage long-term growth for U.S. enterprises and promote efficiency and economic competition through harmonization of standards.

d. Further the policy of reliance upon the private sector to supply Government needs for goods and services.

\* \* \*

**79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014)**

\* \* \*

The petitioners wanted us to require that: (1) All material IBR'd into the CFR be available for free online; and (2) the Director of the Federal Register (the Director) include a review of all documents that agencies list in their guidance, in addition to their regulations, as part of the IBR approval process. We find these requirements go beyond our statutory authority. Nothing in the Administrative Procedure Act (APA) (5 U.S.C. chapter 5), E–FOIA, or other statutes specifically address this issue. If we required that all materials IBR'd into the CFR be available for free, that requirement would compromise the ability of regulators to rely on voluntary consensus standards, possibly requiring them to create their own standards, which is contrary to the NTTAA and the OMB Circular A–119.

\* \* \*

In our discussion of the copyright issues raised by the petitioners and commenters, we noted that recent developments in Federal law, including the *Veeck* decision[14] and the amendments to FOIA, and the NTTAA have not eliminated the availability of copyright protection for privately developed codes and standards referenced in or incorporated into federal regulations. Therefore, we agreed with commenters who said that when the Federal government references copyrighted works, those works should not lose their copyright. However, we believed the responsible government agency should collaborate with the standards development organizations (SDOs) and other publishers of IBR'd materials, when necessary, to ensure that the public does have reasonable access to the referenced documents. Therefore, we proposed in the NPRM to require that agencies discuss how the IBR'd standards are reasonably available to commenters and to regulated entities. One

way to make standards reasonably available, if they aren't already, is to work with copyright holders.

\* \* \*

[14] *Veeck v. Southern Building Code Congress International, Inc.,* 293 F.3d 791 (5th Cir. 2002).

\* \* \*

**H.R. REP. NO. 94-1476 (1976)**
**COPYRIGHT LAW REVISION**
SEPTEMBER 3, 1976.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

\* \* \*

*Proposed saving clause*

Section 8 of the statute now in effect includes a saving clause intended to make clear that the copyright protection of a private work is not affected if the work is published by the Government. This provision serves a real purpose in the present law because of the ambiguity of the undefined term "any publication of the United States Government." Section 105 of the bill, however, uses the operative term "work of the United States Government" and defines it in such a way that privately written works are clearly excluded from the prohibition; accordingly, a saving clause becomes superfluous.

Retention of a saving clause has been urged on the ground that the present statutory provision is frequently cited, and that having the provision expressly stated in the law would avoid questions and explanations. The committee here observes: (1) there is nothing in section 105 that would relieve the Government of its obligation to secure permission in order to publish a copyrighted work; and (2) publication or other use by the Government of a private work would not affect its copyright protection in any way. The question of use of copyrighted material in documents published by the Congress and its Committees is discussed below in connection with section 107.

\* \* \*

- 13a -

**H.R. REP. NO. 104-390 (1995)**
**NATIONAL TECHNOLOGY TRANSFER AND ADVANCEMENT ACT OF 1995**
DECEMBER 7, 1995.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

\* \* \*

## SECTION 12. STANDARDS CONFORMITY.

The Committee understands the crucial role standards play in all facets of daily life and in the ability of the nation to compete in the global marketplace. The United States, unlike the federalized standards system of most other countries, relies heavily on a decentralized, private sector-based, voluntary consensus standards system. Past federal government efforts have concentrated primarily in metrology research, maintenance of national measurement standards, including calibration services and standard reference materials, participation in voluntary standards activities, government-to-government negotiations, and development of standards for governmental purposes. This unique consensus-based voluntary system has served us well for over a century and has contributed significantly to United States competitiveness, health, public welfare, and safety.

Playing an important role in maintaining a future competitiveness edge is the ability to develop standards which match the speed of the rapidly changing technology of the marketplace. While the Committee is aware that the standards role of the federal government is different from that of our trading partners, federal agencies are, nevertheless, major participants in the United States standards system.

The key challenge is to update domestic standards activities, in light of increased internationalization of commerce, and to reduce duplication and waste by effectively integrating the federal government and private sector resources in the voluntary consensus standards system, while protecting its industry-driven nature and the public good. Better coordination of federal standards activities is clearly crucial to this effort.

These issues were raised by the National Research Council (NRC) in its March, 1995 report entitled, "Standards, Conformity Assessment, and Trade in the 21st Century." The NRC report recommended that Congress amend NIST's organic act (15 U.S.C. 271, et seq.) to clarify NIST's lead role in the implementation of a government-wide policy of phasing out the use of federally-developed standards wherever possible, in favor of standards developed by private sector, consensus standards organizations, with input from affected agencies. This policy is already eliminating duplication of effort and conflict between government standards and specifications, and widely-accepted industry practices in the same technical areas. The Committee, after conducting a June 29, 1995 hearing on the issue, adopted the NRC recommendation in this section, making it clear NIST has lead agency responsibility for standards and conformity assessment activities that are interagency in nature.

The section requires NIST to develop a strategic plan to evaluate state and local criteria for accrediting testing laboratories and product certifiers, and to take the lead in efforts to build a network of mutual recognition agreements regarding conformity assessment among federal, state, and local authorities, in the interest of eliminating unnecessary duplication and burden on industry. The collective impact of these changes is to grant NIST a clear statutory mandate to act as the lead agency for ensuring federal use of standards developed by private consensus standards organizations to meet regulatory and procurement needs, and to guide the states toward a national, rationalized system of conformity assessment and certification.

NIST is required to report to Congress on its progress and the feasibility of such actions by January 1, 1996.

In addition, the section codifies the present requirements of Office of Management and Budget (OMB) Circular A-119 and requires agencies, through OMB, to report annually to Congress on the reasons for deviating from voluntary consensus standards when the head of the agency deems that prospective consensus standards are not appropriate to the agency needs. OMB Circular A-119 was originally promulgated in 1982 and revised in 1993. It requires federal agencies to adopt and use standards, developed by voluntary consensus standards bodies, and to

work closely with these organizations to ensure that developed standards are consistent with agency needs. Adherence to OMB Circular A-119 is a matter of great concern to industry and the Committee since the federal record with regard to the use of voluntary consensus standards is mixed, at best.

It is not the Committee's intent to create a bureaucratic reporting requirement, or to slow down standards procurement activities within agencies. It is, however, the intent of the Committee to make private sector-developed consensus standards the rule, rather than the exception. Voluntary, private sector, consensus standards can be developed by standards bodies which include active government participation with industry. In the exceptional situation where federally-developed standards are deemed necessary, the Committee requires the agencies to report any standards development activities to OMB, via NIST.

The Committee does recognize the hard work and extensive conversion now actively underway in certain agencies, such as the Department of Defense, to implement OMB Circular A-119 and understands that this codification of the Circular complements rather than supplants these activities. The Committee understands that these agencies have already implemented procedures for high-level internal review of decisions to write federal standards. The Committee believes codifying OMB Circular A-119, however, should not result in significant changes, if any, in these standards development procedures.

An agency report to OMB required under this section is to be clear and informative, but may be summary in nature. The Committee is not requiring agencies to fully catalog every standards exception in their reporting, but does require that those records be accessible to Congress.

The section will have the effect of assisting agencies in focusing their attention on the need to work with these voluntary consensus standards bodies, whenever and wherever appropriate. It will also assist Congress in monitoring federal agency efforts to implement the OMB Circular A-119. Additionally, the section is consistent with recommendations made to the Committee as part of the NRC testimony regarding its March, 1995 report.

* * *

**U.S. Copyright Office, Compendium of Copyright Office Practices (3d ed. 2017)**

* * *

**313.6(C)(1) U.S. Government Works**

Copyright protection under the Copyright Act is not available for "any work of the United States Government," regardless of whether it is published or unpublished. 17 U.S.C. § 105; *see also* H.R. REP. No. 94-1476, at 58 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 5672. This includes legislation enacted by Congress, decisions issued by the federal judiciary, regulations issued by a federal agency, or any other work prepared by an officer or employee of the U.S. federal government while acting within the course of his or her official duties. It also includes works prepared by an officer or employee of the government of the District of Columbia, the Commonwealth of Puerto Rico, or the organized territories under the jurisdiction of the federal government.

If an applicant states that the U.S. government or any of its agencies, officers, or employees created the work while acting within the scope of their employment, the registration specialist may communicate with the applicant and may refuse registration, even if the claimant is a nongovernmental entity.

There are several exceptions to these rules:

- Although works prepared by officers or employees of the U.S. government within the scope of their employment are not copyrightable, the federal government may receive and hold "copyrights transferred to it by assignment, bequest, or otherwise." 17 U.S.C. § 105. For example, a U.S. government agency may register a website created by a government contractor, provided that the contractor did not create the website for the agency as a work made for hire and provided that the contractor transferred the copyright in that work to that agency.

- Works prepared by officers or employees of the U.S. Postal Service, the Corporation for Public Broadcasting, the Public Broadcasting Services, or National Public Radio are not considered works of the U.S. government. *See* H.R. REP. No. 94-1476, at 59 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 5674 (expressly exempting the U.S. Postal Service).

- Works prepared by officers or employees of the Smithsonian Institution are not considered works of the U.S. government if the author-employee was paid from the Smithsonian trust fund.

- The U.S. Secretary of Commerce may secure copyright for a limited term not to exceed five years in any standard reference data prepared or disseminated by the National Technical Information Service. *See* 15 U.S.C. §290e; H.R. REP. No. 94-1476, at 59-60 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 5673.

- A work prepared by an officer or employee of the U.S. government may be registered if the work was prepared at that person's own volition and outside his or her official duties, even if the subject matter focuses on the author's work for the government. *See* H.R. REP. No. 94-1476, at 58 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 5671.

\* \* \*

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing will be made on February 14, 2018 through the D.C. Circuit CM/ECF system, which will serve counsel of record registered as CM/ECF users.

I hereby certify that the original and eight copies of the foregoing will also be dispatched on February 14, 2018 via FedEx for overnight delivery to the Clerk of the United States Court of Appeals for the District of Columbia Circuit.

ANDREW P. BRIDGES
MATTHEW BECKER
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel: (415) 875-2300
Fax: (415) 281-1350
abridges@fenwick.com
mbecker@fenwick.com

CORYNNE MCSHERRY
MITCHELL L. STOLTZ
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333
Fax: (415) 436-9993
corynne@eff.org
mitch@eff.org

DAVID HALPERIN
1530 P Street NW

Washington, DC 20005
Tel: (202) 905-3434
davidhalperindc@gmail.com

*Attorneys for Appellant Public.Resource.Org, Inc.*


JOHN I. STEWART, JR.
CLIFTON S. ELGARTEN
CROWELL & MORNING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595
Tel: 202-624-2500
Fax: 202-628-5116
jstewart@crowell.com
celgarten@crowell.com

*Attorneys for Appellees American Educational
Research Association, Inc. and American
Psychological Association, Inc. National Council
on Measurement In Education, Inc.*

February 14, 2018                    */s/ Donald B. Verrilli, Jr.*
                                     Donald B. Verrilli, Jr.